# EXHIBIT 9

Deutsche Bank



# Non-Financial Report 2017

# Contents

3 About Deutsche Bank
3 CEO Letter
9 Approach to Sustainability
9 Business Environment and Stakeholder Engagement
12 Sustainability Ratings
12 Topics Covered in this Report

15 Clients
15 Product Suitability and Appropriateness
17 Client Satisfaction
20 Complaint Management
22 Products and Services
33 Digitization and Innovation

37 Conduct and Risk
37 Culture and Conduct
40 Public Policy and Regulation
41 Anti-Financial Crime
45 Environmental and Social Issues
47 Human Rights
49 Climate Risk
51 Information Security
52 Data Protection

54 People and Society
54 People Strategy
64 Corporate Social Responsibility
69 Arts, Culture and Sports

72 Environment
72 In-house Ecology
78 About this Report

79 Supplementary Information
79 Limited Assurance Report of the Independent Auditor regarding the seperate non-financial group report
81 Limited Assurance Report of the Independent Auditor
83 Abbreviations and Acronyms

85 Imprint

87 Back Cover Page

# PAGES 2-40 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Anti-Financial Crime

As a responsible bank, we view how we conduct our business as at least as important as our financial performance. We have a long history of supporting regulations and procedures at international level to combat financial crime, and we consider this as vital to ensuring the stability of banks and the integrity of the international financial system as a whole. This helps to protect the bank from being misused for committing criminal offences. Besides that, ignoring financial crime provisions potentially exposes us to corporate criminal and/or regulatory liability, civil lawsuits, and a loss of reputation.

Anti-Financial Crime (AFC) policies are at least reviewed annually to ensure that new regulation is properly reflected in the policies.

Ultimate responsibility for AFC lies with our Management Board, while our AFC division is tasked with the day-to-day prevention of money laundering and terrorism financing, adhering to sanctions' and embargoes for regimes, and preventing fraud, bribery, and corruption or any other criminal activity. A key objective in 2017 was to strengthen the AFC division therefore, the department increased the number of staff by 60% during the year (excl. Postbank).

The AFC organization is subdivided into Regional, Global, and Central Functions. Their main responsibility is described as follows:

– Regional Functions take responsibility for the regions Deutsche Bank is operating in (Germany, Americas, UK and Ireland, Asia Pacific [APAC], and Europe, Middle East, and Africa [EMEA]).
– Global Functions manage Anti-Money Laundering (AML) / terrorism financing, sanctions & embargoes and anti-fraud, bribery and corruption.
– Central Functions manage topics like risk & controls, investigations, as well as regulatory governance & enforcement

Without prejudice to the Management Board's oversight duty and the delegation of the above-mentioned tasks to the AFC organization, ultimate accountability for the appropriate structuring and execution of transactions / business activities and their corresponding processes lies with the line managers and employees in the respective business divisions.

Every employee must carefully familiarize themselves and keep up to date with applicable policies and regulations to comply with them.

## Employee Training and Engagement

We deliver training to help employees understand regulation, compliance, and AFC. There are a range of courses available depending on audience type (this section does applies to the AFC organization, excl. Postbank).

### Graduates

– Graduate induction week for new joiners in AFC or Compliance departments
– Dedicated training sessions for graduates in all divisions highlighting the importance of managing AFC and conduct risk

### AFC/Compliance Employees

– "First 100 days" induction process
– Various technical development programs on topics such as - "How to conduct an internal investigation"

### Bank Employees

There is a Group-wide AFC curriculum on courses covering AML, fraud awareness, anti-bribery and corruption and sanctions. Uptake of these courses is very high, with very low overdue ratios for late or non-completion.

## AFC Risk & Control

The Global AFC Risk & Controls Team, together with other AFC functions and business divisions or infrastructure functions, assesses and identifies risks of money laundering and terrorism financing, sanctions and embargoes, fraud, bribery and corruption, resulting from our products, services, and client activities. In order to meet these targets, clients, products, and transactions are assessed annually through the Global AFC risk assessment as well as quarterly via Top Risk reporting, which is a Group-wide process and part of our non-financial risk framework. Assessments are continuously enhanced and reviewed to adjust them to the new regulatory requirements.

The Global AFC Risk & Controls Team sets the framework and provides the technical platform for assessments that are conducted on country or legal entity levels.

The key objectives of the risk assessment are to better understand the risks inherent in our products and services, client activities, and the geographic locations we operate in.

## Know Your Client, KYC

The bank's Know Your Client (KYC) Policy sets the rules that govern our Group-wide approach to KYC. In conducting KYC, we seek to comply with all relevant national and international laws and regulations. In 2017, the bank implemented a new KYC program that applies to every country we operate in, paying special attention to high-risk clients (such as politically exposed persons [PEP]), promoting greater business accountability, providing clearer guidance and application, as well as embedding and raising awareness of the bank's risk appetite thresholds. Postbank is applying a KYC framework adjusted to the Postbank business model.

Clients are assessed as part of due diligence and are regularly screened against internal and external criteria. In 2017, we continued to roll out an extended screening program, which serves as the basis for further enhancement with regards to screening effectiveness and efficiency.

As a consequence of due diligence, a client relationship may be declined or subject to monitoring or conditions imposed on accounts, transactions, or product usage. In cases of suspicious activity, regulatory and government bodies are informed according to existing legal and regulatory requirements.

KYC is an ongoing process throughout the lifecycle of the client relationship. As such, we must know not only the client but also the anticipated nature of the client relationship.

The New Client Adoption process deals with the on-boarding of potential clients. No funds or assets may be accepted or transacted, nor any legal commitment entered into (incl. the operation of an account, sale of a product, or rendering of a service), prior to fully completed adoption of the client.

In order to periodically assess client relationships, the business must ensure that regular reviews of all existing clients are initiated and duly performed. Review cycles depend on the risk category of a client relationship. In general, high-risk clients must be reviewed annually, medium-risk clients every two years, and low-risk clients every five years.

Assessing and understanding client-related money laundering and terrorist financing risks is a critical component of our AFC Risk Management framework, which helps us to mitigate and manage risk in line with our financial crime risk appetite.

The primary objective of risk segmenting our client base is to conduct appropriate due diligence and to ensure a comprehensive client profile is in place to enable the comparison of the results of ongoing monitoring and identify any discrepancies.

Our risk rating methodology considers the following aspects of each client relationship to determine a Client Risk Rating: country risk, industry risk, product risk, and entity-type risk. Irrespective of the risk type, if the client is a PEP or an ultimate beneficial owner of the client is a PEP, they will always be classified as high risk.

## Anti-Money Laundering and Terrorism Financing

Within our AFC function, the AML unit is responsible for instituting measures to prevent money laundering and combat the financing of terrorism, including measures to

– comply with rules and regulations regarding identification (authentication), recording, and archiving;
– detect suspicious transactions and process suspicious activity alerts; and
– develop, update, and execute internal policies, procedures, and controls.

Irrespective of the value or amount, if there is a reasonable suspicion that funds have been derived from illegal origins or may be used in the context of terrorism financing, the transaction must be declined.

The AML unit is designed to comply with German rules as a minimum, as well as local laws and regulations in all countries the bank operates in. It includes policies, procedures, a designated Money Laundering Officer, independent controls, and regular employee training. The percentage of overdue AML trainings is 0.08% (excl. Postbank).

We are part of the Wolfsberg Group of Banks and have adopted the Wolfsberg Anti-Money Laundering Principles, as well as signing the Wolfsberg Statement on the Suppression of the Financing of Terrorism.

Despite our efforts to prevent money laundering there have been instances in which the bank agreed to pay civil monetary penalties to settle investigations into the bank's AML control function as further described in our Annual Report 2017, Notes to the Consolidated Balance Sheet, Note 29 – Provisions – Current Individual Proceedings – Russia/UK Equities Trading Investigation.

## Respecting Sanctions and Embargoes

National authorities and supranational organizations (such as UN and EU) impose restrictive measures against countries, organizations, groups, entities, and individuals that infringe internationally accepted behaviors and norms, especially where these relate to weapons proliferation, terrorism, or the support of terrorist organizations, human rights violations, or corruption and bribery. Such measures are more commonly known as embargoes or sanctions.

Deutsche Bank has a responsibility to monitor, evaluate, and, if required, observe laws and binding requirements related to financial and trade sanctions set by the EU, Bundesbank, Germany's Federal Office for Economic Affairs and Export Control, and other authorities, such as the US Office of Foreign Assets Control (OFAC) and the UK Treasury Department.

Our Group-wide Embargo Policy, Special Risk Country Policy, and a specific Office of Foreign Assets Control Policy help us to assess and reduce client risk as part of our on-boarding processes and periodically thereafter. It also helps us to manage risks related to particular transactions, countries, and goods.

In the wake of the implementation of the Joint Comprehensive Plan of Action entered into by world powers and Iran at the start of 2016, we have very cautiously relaxed our otherwise stringent policy towards Iran and, in 2017, we continued to execute legal payments in euros on behalf of our long-standing clients, subject to enhanced due diligence.

Please note that the bank has entered into agreements with certain U.S. regulatory and law enforcement agencies to resolve investigations concerning U.S. Embargoes-Related Matters as further outlined in our Annual Report 2017, Notes to the Consolidated Balance Sheet, Note 29 – Provisions – Current Individual Proceedings – U.S. Embargoes-Related Matters.

## Fraud Prevention

Fraudulent incidents may give rise to material financial loss for either Deutsche Bank or its clients. They may also negatively impact the bank's reputation or trigger regulatory and legal action. Anti-fraud prevention and investigation is therefore important to mitigate exposure to these incidents for the bank and its clients.

Our Group-wide Anti-Fraud policy applies to all employees, laying out how to immediately escalate any known or suspected fraudulent incident, for example, via the whistleblower hotline. All issues raised are dealt with anonymously where requested, and we will not take any action against the originator if an allegation is made in good faith. All individuals engaged for or on behalf of Deutsche Bank are called upon to report any concerns or suspicions regarding possible violations of laws, rules or regulations, or possible violations of internal Deutsche Bank policies, standards, or procedures, including Deutsche Bank's Values & Beliefs. In 2017, the AFC organization (excl. Postbank) recorded 159 whistleblowing cases. Any reports received are reviewed to establish their nature, content, and urgency, and if necessary an internal investigation is started on the incident.

In relevant business divisions Mandatory Time Away (MTA) is an important anti-fraud control for the prevention and detection of unauthorized or inappropriate activity by staff in sensitive positions.

By enforcing MTA, employees must be deterred and prevented from undertaking any unauthorized or inappropriate scheme or activity that might require continuous on-site presence and/or system access.

## Combating Bribery and Corruption

Bribery and corruption risks can arise in our daily operations. Bribery means improperly offering, promising, giving, authorizing, soliciting, agreeing to receive or accepting anything of value to or from another person or entity. Corruption means any activity that involves the abuse of position or power for an improper personal or business advantage, whether in the public or private sector.

Deutsche Bank takes a zero-tolerance approach to bribery and corruption, in line with its Code of Business Conduct and Ethics, values and beliefs, and international law, including the UK Bribery Act 2010, the US Foreign Corrupt Practices Act 1977, the German Criminal Code, and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

Reflecting our commitment to comply with applicable law and regulations, as well as best practice standards, our Anti-Fraud, Bribery and Corruption (AFBC) unit is responsible for:

– monitoring and advising on compliance related to bribery and corruption laws, regulations, and international standards;
– the ongoing design and development of appropriate measures to mitigate bribery and corruption risk; and
– administering controls and safeguards to mitigate bribery and corruption risk.

The ABC Policy sets out the minimum standards of behavior expected by all employees and third parties associated with Deutsche Bank (incl. partners, suppliers, service providers, and third parties, to the extent they perform services for the Group, subject to contractual agreements).

Staff reliability checks are conducted for all new hires. An updated reliability check process for existing employees was rolled out during 2017.

Every employee is responsible for the prevention, detection, and reporting of bribery and other forms of corruption in connection with our business. Bribery and corruption have serious consequences for employees and the bank. An employee who gives, receives or agrees to give or receive a bribe violates the ABC Policy, the Code of Business Conduct and Ethics and is committing a criminal and/or regulatory offence potentially exposing us to corporate criminal and/or regulatory liability and civil lawsuits locally and globally. The employee may also be subjected to civil or criminal fines and penalties and/or imprisonment. Senior management can be prosecuted and may be personally liable if they become aware that an act of bribery has taken place, or will take place, and do not take appropriate action to prevent it. Equally, we may terminate relationships with any third party found to be in breach of the principles and rules set out in the ABC Policy or applicable bribery and corruption laws and regulations.

To deliver the policy, regional teams are responsible for analyzing risk, developing and monitoring controls, training, and awareness.

## Preventing Other Criminal Activities

As well as tackling fraud, bribery, and corruption offenses, the Global Head of AFC is responsible for ensuring that measures to prevent other criminal activities—derived from the German Penal Code—which could endanger institutional assets (see section 25 of the German Banking Act), are fit for purpose. Examples include damage to property, robbery, cybercrimes, and antitrust offences.

A dedicated Central Unit Coordination Team is in place to manage this and it is overseen by Group and Regional Financial Crime Governance Committees, chaired by the Global and Regional Heads of AFC respectively. Within Postbank, a Central Unit is implemented to oversee the prevention of other criminal activities.

# PAGES 45-87 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES