**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALI KARIMI, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, CHRISTIAN SEWING, MARCUS SCHENCK, and JAMES VON MOLTKE, <br><br> Defendants. | Case No.  2:20-cv-08978-ES-MAH |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a), OR IN THE ALTERNATIVE, DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 2

I.    Defendants Made False and Misleading Statements About the Bank's Know-Your-Customer Processes ........................................................................ 2

II.    In Reality, Deutsche Bank Skirted KYC Procedures ................................... 3

    A.    Deutsche Bank Onboarded and Serviced High-Risk Clients Without Any Meaningful Due Diligence and With the Approval, Involvement, and Consent of Its Top Echelon ......................................................................... 3

    B.    Deutsche Bank Onboarded and Serviced Child Sex Trafficker and Abuser Jeffrey Epstein, Aiding and Abetting His Criminal Activities ....... 6

    C.    Deutsche Bank Onboarded and Serviced Eastern European Oligarchs Reportedly Engaged in Criminal Activity ...................................... 7

        1.    Deutsche Bank Onboarded and Serviced PEP Igor Putin ............... 7

        2.    Deutsche Bank Onboarded and Serviced PEP Roman Abramovich .......................................................................................... 8

        3.    Deutsche Bank Onboarded and Serviced the Founders of the Hezbollah Terrorist Organization, a Billionaire Suspected of Financing Terrorism, and Two PEPs Linked to a Mexican Drug Cartel .......................................................................................... 8

III.    THE COURT SHOULD NOT TRANSFER THIS ACTION ............................... 9

    A.    The Private Interest Factors Do Not Weigh Strongly in Favor of Transfer ........................................................................................................ 9

        1.    Plaintiffs' Choice of Forum Should Be Given Some, if Not Considerable,  Deference ............................................................... 9

        2.    Litigation in the Southern District of New York Is Not More Convenient Than in the District of New Jersey ......................... 13

    B.    The Public Interest Factors Do Not Favor Transfer ............................... 15

IV.    THE COMPLAINT PLEADS SECURITIES EXCHANGE ACT VIOLATIONS ............................................................................................ 19

    A.    Applicable Pleading Standards Do Not Favor Dismissal ........................ 19

    B.    The Complaint Pleads Materially False and Misleading Statements and Omissions ..................................................................................... 20

        1.    Defendants' Representations Are Actionable ............................... 20

        2.    Defendants' Truth-on-the-Market Defense Fails ......................... 26

3. The Complaint Pleads Actionable Omissions.............................. 30

4. The Complaint Alleges Misrepresentations, Not
Mismanagement .............................................................. 31

C. The Complaint Pleads Scienter .................................................. 33

1. The Specific Findings of the British Authority and Deutsche
Bank's Own Audits Support a Strong Inference of Scienter ........ 33

2. Additional Direct and Circumstantial Evidence Strongly Supports
Defendants' Scienter ...................................................... 37

3. Motive, Though Not Required, Is Alleged .................................. 41

V. THE COMPLAINT STATES SECTION 20(A) CLAIMS ................................. 42

CONCLUSION..................................................................................... 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny County Employees' Ret. Sys. v. Energy Transfer LP*,
 2021 WL 1264027 (E.D. Pa. Apr. 6, 2021) ........................................................17, 34

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 955 F.3d 254 (2d Cir. 2020)..................................................................................22

*Atlantic Marine Constr. Co., Inc. v. United States Dist. Court for the W. Dist. Of Texas*,
 134 S. Ct. 568 (2013)..............................................................................................18

*Bachmann Software & Servs. v. Intouch Grp., Inc.*,
 2008 WL 2875680 (D.N.J. July 22, 2008)..............................................................11

*Bank United, NA v. GC of Vineland, LLC*,
 2020 WL 3453817 (D.N.J. May 28, 2020),
 *report and recommendation adopted sub nom.*, *Bank United, NA. v. First Chatham Bank*,
 2020 WL 3452152 (D.N.J. June 23, 2020)..............................................................19

*Beres v. Thomas McKinnon Sec., Inc.*,
 1987 WL 16977 (S.D.N.Y. Sept. 10, 1987).............................................................10

*Berkowitz v. Conrail, Inc.*,
 1997 WL 611606 (E.D. Pa. Sept. 25, 1997) ...........................................................31

*Bing Li v. Aeterna Zentaris, Inc.*,
 2016 WL 827256 (D.N.J. March 2, 2016)...............................................................42

*Carmack v. Amaya Inc.*,
 2017 WL 2610673 (D.N.J. June 15, 2017)..............................................................33

*Celgene Corp. v. Abrika Pharms., Inc.*,
 2007 WL 1456156 (D.N.J. May 17, 2007)...............................................................10

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014)....................................................................................25

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
 423 F. Supp. 2d 348 (S.D.N.Y. 2006).....................................................................32

*Clark v. Burger King Corp.*,
 255 F. Supp. 2d 334 (D.N.J. 2003) ..........................................................................9

*Cohn v. Metro. Life Ins. Co.*,
 2007 WL 1573874 (May 31, 2007) .........................................................................19

*Cottman Transmission Sys. v. Martino*,
  36 F.3d 291 (3d Cir. 1994)......................................................................................12

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018).............................................................30

*E'Cal Corp. v. Office Max, Inc.*,
  2001 WL 1167534 (E.D. Pa. Sept. 7, 2001) ..........................................................19

*Ellis v. Costco Wholesale Corp.*,
  372 F. Supp. 2d 530 (N.D. Cal. 2005) ...................................................................10

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
  2020 WL 3026536 (D.N.J. June 5, 2020)...............................................................41

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000)....................................................................................30

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019)....................................................................................22

*Fitzer v. Security Dynamics Techs.*,
  119 F. Supp. 2d 12 (D. Mass. 2000) .......................................................................40

*Franklin U.S. Rising Dividends Fund v. Am. Int'l Grp.*,
  2014 WL 1555133 (D.N.J. Apr. 14, 2014) .............................................................16

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ......................................................................29

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000).....................................................................................26

*Green v. Deutsche Bank Aktiengesellschaft*,
  2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019)..................................................17, 25

*Greenhouse v. MCG Cap. Corp.*,
  392 F.3d 650 (4th Cir. 2004) ..................................................................................29

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp.2d 212 (S.D.N.Y. 2008)......................................................................40

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019)........................................................24, 25

*Hayes v. Gross*,
  982 F.2d 104 (3d Cir. 1992).....................................................................................32

iv

*Ieradi v. Mylan Labs. Inc.*,
   230 F.3d 594 (3d Cir. 2000)..................................................................................22

*In re 3M Co.*,
   2020 U.S. App. LEXIS 36961 (3d Cir. Nov. 18, 2020)...............................11, 12, 15

*In re 3M Co. Sec. Litig.*,
   2020 WL 5105233 (D.N.J. Aug. 31, 2020) ..............................................................9

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................35

*In re Aetna Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) .......................................................................31

*In re Amarin Corp. PLC, Sec. Litig.*,
   2015 WL 3954190 (D.N.J. June 29, 2015) .............................................................42

*In re Amkor Technology, Inc. Sec. Litig.*,
   2006 WL 3857488 (E.D. Pa. Dec. 28, 2006)..........................................................16

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011).....................................................................34

*In re Bristol-Myers Squibb Sec. Litig.*,
   2005 WL 2007004 (D.N.J. Aug. 17, 2005) .............................................................31

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir.1997)..................................................................................29

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005)..............................................................30

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................30

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) ...............................................................41

*In re Cognizant Technology Solutions Corp. Sec. Litig.*,
   2020 WL 3026564 (D.N.J. June 5, 2020)..........................................................21, 41

*In re Coudert Bros. LLP*,
   673 F.3d 180 (2d Cir. 2012)...................................................................................17

*In re Craftmatic Sec. Litig.*,
   890 F.2d 628 (3d Cir. 1989)...................................................................................31

v

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ......................................................17, 24, 25, 36

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
    2019 WL 1299673 (D.N.J. Mar. 21, 2019)...............................................................................22

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)......................................................................................35

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015).........................................................................26, 28

*In re EQT Corp. Sec. Litig.*,
    2020 WL 7059556 (W.D. Pa. Dec. 2, 2020)............................................................................28

*In re Hertz Global Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018).....................................................................................................32

*In re Laidlaw Sec. Litig.*,
    1991 WL 170837 (E.D. Pa. Aug. 27, 1991) ...........................................................................10

*In re Lucent Techs. Inc., Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002) .......................................................................11, 20, 24, 30

*In re Magnum Hunter Resources Corp. Sec. Litig.*,
    26 F.Supp.3d 278 (S.D.N.Y. 2014) .........................................................................................32

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................................................41

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........................................................................26, 28

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013)..................................................................................41

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    2015 WL 2250472 (D.N.J. May 13, 2015)..........................................................................26, 42

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).................................................................................................24, 39

*In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,
    543 F.3d 150 (3d Cir. 2008),
    *aff'd sub nom.*, *Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)..................................................................................................................26

vi

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d 901 (D.N.J. 1998) .......................................................................32

*In re Navient Corp. Sec. Litig.*,
   2019 WL 7288881 (D.N.J. Dec. 30, 2019) ...........................................................34

*In re NUI Sec. Litig.*,
   314 F. Supp. 2d 388 (D.N.J. 2004) .......................................................................41

*In re PMA Cap. Corp. Sec. Litig.*,
   2005 WL 1806503 (E.D. Pa. July 27, 2005).....................................................24, 32

*In re PTC Therapeutics, Inc., Sec. Litig.*,
   2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...........................................................33

*In re RAIT Fin. Tr. Sec. Litig.*,
   2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .........................................................23

*In re Snap Inc. Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) .........................................................28

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..............................................................39

*In re U.S. Interactive, Inc.*,
   2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ........................................................23

*In re USA Techs., Inc. Sec. Litig.*,
   2019 WL 4785780 (D.N.J. Sept. 30, 2019) ...........................................................16

*In re Veritas Software Corp. Sec. Litig.*,
   2006 WL 1431209 (D. Del. May 23, 2006)...........................................................40

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996).....................................................................................30

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014).........................................................................22

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)............................................................................. *passim*

*Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010).................................................................................24

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)..............................................................................................17

*Jaroslawicz v. M&T Bank Corp.*,
  962 F.3d 701 (3d Cir. 2020)............................................................................................. *passim*

*Jumara v. State Farm Ins. Co.*,
  55 F.3d 873 (3d Cir. 1995)..........................................................................................9, 14

*Keeton v. Hustler Mag., Inc.*,
  465 U.S. 770 (1984).........................................................................................................18

*Kline v. First W. Gov't Sec., Inc.*,
  24 F.3d 480 (3d Cir. 1994)...........................................................................................1, 31

*Kumar v. Kulicke and Soffa Industries, Inc.*,
  2019 WL 5081896 (E.D. Pa. Oct. 9, 2019)....................................................................37

*Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb, Inc.*,
  2006 WL 1524590 (S.D.N.Y. June 5, 2006) ..................................................................16

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................................28

*Lawrence v. Xerox Corp.*,
  56 F. Supp. 2d 442 (D.N.J. 1999) ...................................................................................10

*Lewis v. Straka*,
  2006 WL 2927658 (E.D. Wis. Oct. 12, 2006) ................................................................34

*Li v. Aeterna Zentaris, Inc.*,
  2016 WL 3583821 (D.N.J. June 30, 2016) .....................................................................41

*Local 731 I.B. of T. Excavators and Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011)....................................................................39

*Marsden v. Select Med. Corp.*,
  2006 WL 891445 (E.D. Pa. Apr. 6, 2006) ......................................................................22

*Master Cutlery, Inc. v. Panther Trading Co.*,
  2012 WL 6597056 (D.N.J. Dec. 17, 2012)...........................................................1, 11, 15

*Messner v. USA Technologies, Inc.*,
  2016 WL 1466543 (E.D. Pa. Apr. 13, 2016) ..................................................................37

*Metro. Life Ins. Co. v. Bank One, N.A.*,
  2012 WL 4464026 (D.N.J. Sept. 25, 2012) ....................................................................16

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)...........................................................................22, 23, 30

*Mitsubishi Tanabe Pharma Corp. v. Sandoz, Inc.*,
  2021 WL 1845499 (D.N.J. Apr. 7, 2021) ...................................................................14

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................24

*NPR, Inc. v. Am Intern. Ins. Co. of Puerto Rico*,
  2001 WL 294077 (D.N.J. Mar. 28, 2001)..................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund et al*,
  135 S. Ct. 1318 (2015)..............................................................................................26

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)................................................................................30, 31

*Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012).......................................................................41

*Palladin Partners v. Gaon*,
  2006 WL 2460650 (D.N.J. Aug. 22, 2006) ...............................................................40

*Park Inn Intern., LLC v. Moody Enters., Inc.*,
  105 F. Supp. 2d 370 (D.N.J. 2000) .............................................................................9

*Plum Tree, Inc. v. Stockment*,
  488 F.2d 754 (3d Cir. 1973).......................................................................................11

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1993) ...................................................................................26

*Prudential v. Goldman, Sachs*,
  2013 WL 1431680 (D.N.J. Apr. 9, 2013) ..................................................................24

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013).......................................................................................33

*Ravens v. Republic New York Corp.*,
  2002 WL 1969651 (E.D. Pa. Apr. 24, 2002) .............................................................32

*Rosen v. Fid. Fixed Income Tr.*,
  1995 WL 560037 (E.D. Pa. Sept. 20, 1995) .........................................................13, 15

*Santi v. Nat'l Bus. Records Mgmt., LLC*,
  722 F. Supp. 2d 602 (D.N.J. 2010) ............................................................................10

*Santomenno v. Transamerica Life Ins. Co.*,
  2012 WL 1113615 (D.N.J. Mar. 30, 2012)...................................................11, 15, 16

ix

*Sec. Inv. Prot. Corp. v. Vigman*,
   764 F.2d 1309 (9th Cir. 1985) ...................................................................................10

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000).......................................................................................30

*Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
   729 F. (2d Cir. 2018)...........................................................................................36, 37

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)............................................................................. *passim*

*Shutte v. Armco Steel Corp.*,
   431 F.2d 22 (3d Cir. 1970)......................................................................................9, 18

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010).......................................................................................30

*Sovereign Bank, F.S.B. v. Rochester Cmty. Sav. Bank*,
   907 F. Supp. 123 (E.D. Pa. 1995) ..............................................................................10

*Stepak v. Katz*,
   1985 WL 5816 (E.D. Pa. Aug. 19, 1985) ...................................................................10

*Sun v. Han*,
   2015 WL 9304542 (D.N.J. Dec. 21, 2015) .................................................................40

*Takata v. Riot Blockchain, Inc.*,
   2020 WL 2079375 (D.N.J. Apr. 30, 2020) .................................................................32

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.l Inc.*,
   531 F.3d 190 (2d Cir. 2008)........................................................................................41

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   127 S. Ct. 2499 (2007*)*....................................................................................... *passim*

*The Winer Family Trust v. Queen*,
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) ............................................................42

*True Health Chiropractic Inc. v. McKesson Corp.*,
   2013 WL 6000539 (N.D. Cal. Nov. 12, 2013) .....................................................17, 18

*U.S. SEC v. Mudd*,
   885 F. Supp. 2d 654 (S.D.N.Y. 2012).........................................................................28

*Urbach v. Sayles*,
   1991 WL 236183 (D.N.J. Sept. 4, 1991) ....................................................................22

*Valeant Pharm. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ...............................................................26

*Van Dusen v. Barrack*,
  376 U.S. 612 (1964) ..............................................................................................18

*Virginia Bankshares v. Sandberg*,
  501 U.S. 1083 (1991) .............................................................................................23

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015) ...........................................................23

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir.1997)......................................................................................24

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017).....................................................................................31

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007).....................................................................................37

*Wojtunik v. Kealy*,
  2003 WL 22006240 (E.D. Pa. 2003) .......................................................................16

*Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*,
  2020 WL 4794533 (D. Del. Aug. 18, 2020) ............................................................14

*Yang v. Odom*,
  409 F. Supp. 2d 599 (D.N.J. 2006) ..........................................................................16

*Yocham v. Novartis Pharms. Corp.*,
  565 F. Supp. 2d 554 (D.N.J. 2008) ............................................................................9

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
  2020 WL 3169506 (D.N.J. June 12, 2020) ..............................................................42

## Statutes

28 U.S.C. §1404(a) ..........................................................................................9, 18

Securities and Exchange Act of 1934 .................................................................. *passim*

## Rules

Fed. R. Civ. P. 8.......................................................................................................42

Fed. R. Civ. P. 45(b)(2)(B) ......................................................................................14

**PRELIMINARY STATEMENT**

This case centers on allegedly incomplete, false and misleading statements made by Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank") and certain of its top officials (collectively, Defendants). Throughout the relevant time, Defendants repeatedly issued false and misleading statements concerning the Bank's Know-Your-Customer ("KYC") processes, a critical safeguard against money laundering and the financing of other criminal activities. Conducting robust due diligence on customers was necessary to safeguard the Bank's reputation, its "most valuable asset," and to prevent the commission of crimes that would subject the Bank to civil or criminal penalties. Second Amended Class Action Complaint ("Compl.") ¶¶44-45. Investors relied on Defendants' KYC representations, which kept the price of Deutsche Bank's securities artificially inflated during the Class Period. When the truth came out through a series of partially corrective disclosures, Deutsche Bank's stock price plunged, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors. This action seeks to recuperate those losses pursuant to claims arising under the Securities and Exchange Act of 1934, which prohibits the issuance of false and misleading statements in connection with the purchase or sale of a security.

Defendants raise a number of arguments, none of which have merit. *First*, they seek transfer to a venue they deem more favorable to their quest for dismissal, but in so doing they obfuscate the nature of the claims alleged—the polestar for determining the "locus of . . . culpable conduct." *Master Cutlery, Inc. v. Panther Trading Co.*, 2012 WL 6597056, at *4-5 (D.N.J. Dec. 17, 2012) (Hammer, J.). And they fail to demonstrate why the remaining requirements favor transfer. *Second*, they deem the alleged representations aspirational and immaterial, and at most raising an inference of mismanagement. But, when properly examined in the context in which they arise, the representations fall comfortably within the ambit of securities fraud violations. *See*,

1

*e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992). *Third*, Defendants conveniently disregard many of the scienter allegations, a practice the Supreme Court proscribes. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 127 S. Ct. 2499, 2509 (2007*)*. When viewed holistically, the "most plausible inference" is that Defendants—who were privy to internal audit reports showing KYC violations, armed with other red flags of KYC deficiencies, and are even alleged to have participated in skirting KYC requirements—acted with at least recklessness. For the reasons set forth herein, Defendants' motion should be denied in its entirety.

## STATEMENT OF FACTS

### I.    DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS ABOUT THE BANK'S KNOW-YOUR-CUSTOMER PROCESSES

As a regulated financial institution, Deutsche Bank is required to have adequate Anti-Money Laundering ("AML") safeguards in place, and to devise and implement systems reasonably designed to identify suspicious activity and block improper transactions. Compl ¶36. KYC due diligence is a critically important process of AML compliance. *Id*. Deutsche Bank is required to collect customer information at the time of establishing new relationships with clients and throughout the existence of those relationships. *Id*. Particularly with respect to high-risk clients, Deutsche Bank must continuously scrutinize relevant factors such as the nature of the client's business, the purpose of the client's accounts, the recipients and beneficiaries of bank transfers, and the nature of the client relationship. *Id*. ¶37.

Throughout the Class Period, Defendants made materially false and misleading statements regarding the Bank's KYC processes. For example, Defendants repeatedly assured investors that Deutsche Bank has "developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance,"

and insisted that "[o]ur KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews." *Id*. ¶¶141, 156, 171.  Defendants also claimed its "robust and strict" KYC program "includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships," with "[s]pecial safeguards . . . implemented for . . . politically exposed persons…"  *Id*. ¶¶143, 158, 173.

In truth, however, far from implementing a "robust and strict" KYC program with "special safeguards" for politically exposed persons ("PEPs"), during the Class Period, Defendants repeatedly exempted high-net-worth individuals and PEPs (including unsavory figures like Jeffrey Epstein and individuals sponsoring terrorism) from any meaningful due diligence, enabling their criminal activities through the use of the Bank's facilities. *Id*. ¶5.  That practice commenced with Deutsche Bank's former CEOs onboarding, retaining and servicing Russian oligarchs and PEPs reportedly engaged in criminal activities.  *Id*. ¶¶6, 49-50, 53, 55, 103-134.

## II.    IN REALITY, DEUTSCHE BANK SKIRTED KYC PROCEDURES

### A.    Deutsche Bank Onboarded and Serviced High-Risk Clients Without Any Due Diligence and With the Approval and Involvement of Its Top Echelon

CW1, a Compliance Officer at Deutsche Bank for approximately eight years, who was involved in identifying KYC violations, explained that at Deutsche Bank, as a general rule, the more notorious a person becomes, the higher up the corporate ladder any decision-making process will be taken.  *Id*. ¶49.  According to CW1, in the case of really notorious Russian oligarchs and the like, the onboarding and retainer of such clients only occurred with the approval of the highest-level authorities: the CEO, the COO, and Deutsche Bank's Board.  *Id*.  Epstein, in particular, was discussed at Deutsche Bank's Board level.  To understand this phenomenon, it bears providing some context, particularly into Deutsche Bank's relationship with Russia. *Id*.

Deutsche Bank was introduced, at a very high level, to Russian oligarchs through the Foreign Investment Advisory Council ("Council"), a consultative forum for foreign businesses and the Russian government to meet and discuss economics and the business world. *Id*. ¶50. Deutsche Bank was one of the earliest members of the Council, with former Deutsche Bank CEO Josef Ackermann himself being a member of the Council since at least 2010. *Id*. ¶51. According to CW1, serving on the Council carries considerable prestige: for Ackermann, this prestige was boosted by several personal meetings with Russian president Vladimir Putin. *Id*. According to CW1, Ackermann boasted that Council membership provided Deutsche Bank with "enormous opportunities" as it gave him access to the highest levels of Russian businessmen and politicians. *Id*. ¶52. Ackermann also boasted that he was "well on his way to getting a Russian diplomatic passport." *Id*. Following Ackermann's retirement, Juergen Fitschen, the Bank's co-CEO from 2012 to 2016, attended Russian Council meetings on behalf of Deutsche Bank. *Id*. ¶51.

CW1 explained that Ackermann approved the onboarding of many high-risk Russian oligarchs and PEPs, without having performed any due diligence. *Id*. ¶53. Those individuals posed significant money laundering and reputational risks for the Bank and should have never been onboarded or maintained as clients. *Id*. Public records showed these individuals had clearly violated compliance and AML guidelines before they were onboarded. *Id*. CW1 explained that Deutsche Bank typically does not conduct due diligence on high-net-worth clients. *Id*. ¶54. For example, in the case of oligarchs and other high-net-worth individuals such as Roman Abramovich and Vitaly Yusufov (discussed below), the onboarding took place in seconds. *Id*. Likewise, CW1 said no due diligence was conducted on Epstein. *Id*.

Epstein himself had several connections with Russia, and they explain at least in part how Epstein was welcomed aboard by Deutsche Bank and remained a client during the Class Period.

4

*Id*. ¶¶55, 99.  Epstein met on several occasions with Russia's president Vladimir Putin.  *Id*. ¶55. Epstein is also linked to Russia through his former girlfriend's father.  *Id*.  Epstein's former girlfriend, Ghislaine Maxwell, is the daughter of the late publisher Robert Maxwell.  *Id*.  Maxwell was a business associate of Semion Mogilevich, a reportedly notorious Russian mobster with many links to politicians in Russia, and is known to have been involved in prostitution. *Id*.  Ghislaine Maxwell is accused of recruiting women, many of them Russian, to prostitute themselves to Epstein.  *Id*.  While her father was alive, Ghislaine had access at high level to many politicians and Russian oligarchs.  *Id*.  As described below, Epstein's accounts at Deutsche Bank record a large number of suspicious payments to Russia, including to his co-conspirators and to young girls, who were the victims of Epstein's sexual abuse or otherwise lured by Epstein into prostitution.  *Id*.

CW1 also explained that with regards to sanctioned persons and companies,  it was standard practice at Deutsche Bank to circumvent sanctions.  *Id*. ¶60.  To evade these rules, the persons or companies that had been sanctioned would be onboarded by Deutsche Bank in a country where they were not sanctioned.  *Id*.  For example, if a Russian individual was sanctioned in the United States, Deutsche Bank would onboard that client in Germany.  *Id*.  This person would then be permitted to conduct business in the United States by setting up a company in the United States as a proxy.  *Id*.  This company would in turn transact business with Deutsche Bank.  *Id*.  Deutsche Bank USA would not perform KYC diligence on the company because such due diligence would be a waste of resources, as the client had already been onboarded.  *Id*.

Another witness, CW3, who worked at the Bank from February 2018 to January 2020 as a Vice President/Anti-Financial Crimes ("AFC") Principal Auditor for Sanctions and Embargoes, recounted that during the Class Period, Deutsche Bank was in possession of critical audit findings in three different areas showing that its AML processes were deficient: (i) the Bank was "not going

through the right protocols to onboard" clients, specifically high-net-worth, Wealth Management clients; (ii) Deutsche Bank circumvented sanctions by onboarding sanctioned clients in other countries; and (iii) Deutsche Bank was engaging in "wire stripping," a "type of money laundering" that involved removing the actual name of the sanctioned individuals and entities from a wire transfer and replacing it with a "fictitious" or "straw company" name. *Id*. ¶¶25, 61-63.

**B.    Deutsche Bank Onboarded and Serviced Child Sex Trafficker and Abuser Jeffrey Epstein, Aiding and Abetting His Criminal Activities**

Jeffrey Epstein was a wealthy American financier with more than 500 million dollars in assets and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires. *Id*. ¶77. Despite widespread coverage of Epstein's child sex trafficking and abuse, Deutsche Bank's executives onboarded Epstein as a client in 2013, enabling his criminal activities to continue. *Id*. ¶¶ 78-80. In addition to opening and servicing wealth-management accounts for Epstein, Deutsche Bank also provided loans to Epstein and his businesses. *Id*. ¶80. Epstein was onboarded based on the lucrative business it would generate the Bank, with Deutsche Bank estimating "*flows of $100-300 [million] overtime [SIC] (possibly more) w/ revenue of $2-4 million annually over time*…." Despite knowing that by 2011 "*40 underage girls had come forward with testimony of Epstein sexually assaulting them*," Deutsche Bank remained "*comfortable with things continuing*" with Epstein "*not[ing] a number of sizable deals recently*." *Id*. ¶¶81-90. CW8, who was a Deutsche Bank KYC Case Manager and an AML and Business Risk Associate during part of the Class Period, explained that after Epstein was onboarded, decisions about whether to continue keeping him as a client were repeatedly escalated, including to Deutsche Bank's Reputational Risk Committee, and members of Deutsche Bank's Executive Committee for the bank's Global Wealth Management repeatedly approved retaining and servicing Epstein. *Id*. ¶¶30, 102.

6

From 2013 to and including 2018, one of Epstein's attorneys withdrew from Epstein's personal accounts *over $800,000.00 in cash*, for the stated purpose of using the funds "for tipping and household expenses." *Id*. ¶99. The lawyer had repeatedly asked Bank officials how much money could be withdrawn without triggering some kind of alert. *Id*. Deutsche Bank never sought or received an explanation, nor did it conduct any due diligence about the recipients of such payments. *Id*. From the time of Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore should have been subject to enhanced due diligence. *Id*. ¶100. Instead, in a twist of irony, the Bank designated Epstein an "***Honorary*** PEP." *Id*. According to CW1, despite the obvious fact that Epstein was a high-risk client, Deutsche Bank didn't treat him as such. *Id*. CW8 corroborates that Deutsche Bank had a KYC "special deal" for Epstein and other high-net-worth individuals. *Id*. ¶101. CW8 explained that such individuals were not required to submit to the normally required KYC documentation. *Id*.

### C.    Deutsche Bank Onboarded and Serviced Eastern European Oligarchs Reportedly Engaged in Criminal Activity

Jeffrey Epstein was not the only unsavory character on Deutsche Bank's client roster. *Id*. ¶103. As a matter of practice at the highest level of the corporation, unbeknownst to investors, the Bank routinely onboarded, retained and serviced without due diligence and safeguards, many individuals reportedly engaged in criminal activities, in reckless disregard of the crimes they helped perpetrate and despite the reputational risks they posed to the Bank. *Id*.

#### 1.    Deutsche Bank Onboarded and Serviced PEP Igor Putin

Igor Putin was a client of Deutsche Bank until 2019. *Id*. ¶104. He is the first cousin of Russian President Vladimir Putin, and himself a Russian businessman, politician, and former VP of Master Bank, a private Russian bank. *Id*. Igor Putin was associated with a number of companies engaged in money laundering. *Id*. Deutsche Bank did not conduct any due diligence on him. *Id*.

7

### 2.    Deutsche Bank Onboarded and Serviced PEP Roman Abramovich

Roman Abramovich is a current client of Deutsche Bank.  *Id*. ¶109.  Abramovich, an Israeli-Russian billionaire businessman and politician, was onboarded by Deutsche Bank's former CEO Josef Ackermann.  *Id*.  Deutsche Bank did not conduct any due diligence on Abramovich. *Id*.  Abramovich is the primary owner of the British private investment company Millhouse LLC. *Id*.  Deutsche Bank is an advisor to Millhouse Capital.   The Bank also loaned $700 million to Abramovich's steel company Evraz. *Id*.  Abramovich has been arrested and sent to prison for theft of government property. *Id*. ¶111.  In an unrelated matter, he admitted in court proceedings that he paid millions in bribes to government officials to acquire assets of an oil company. *Id*. ¶113. Abramovich is under "suspicion of money laundering and presumed contacts with criminal organizations," and his assets are "at least partially of illegal origin." *Id*. ¶115.  Abramovich is named in the Countering America's Adversaries Through Sanctions Act. *Id*. ¶114.

### 3.    Deutsche Bank Onboarded and Serviced the Founders of the Hezbollah Terrorist Organization, a Billionaire Suspected of Financing Terrorism, and two PEPs Linked to a Mexican Drug Cartel

Several confidential witnesses gave examples of other PEPs and high-risk individuals or entities the Bank retained and serviced as clients.  CW9, who worked at the Company as an AML Financial Crime Investigations Analyst during part of the Class Period, identified a string of "five and dime" "mom and pop stores" in Kazakhstan that were transferring about half a million dollars every day through the stores. *Id*. ¶¶31, 119.  CW9 determined that the stores were linked to "the two founders, the two brothers of the Hezbollah terrorist organization." *Id*. ¶120.

According to CW10, who was an AFC, AML Officer for Wealth Management clients during part of the Class Period, Deutsche Bank serviced a billionaire who was a relative of one of the founders of Al Rajhi Bank in Saudi Arabia, an entity long suspected of financing terrorists. *Id*. ¶¶32, 123.  CW10 also found that one of the account holder's relatives, who was using the account

8

holder's account, was (and still is) on the FBI's Most Wanted Fugitive list for terrorism.  *Id.*

According to CW11, who worked at Deutsche Bank as a Senior KYC Risk Analyst during part of the Class Period, Deutsche Bank's Anti-Financial-Crime unit approved two billionaire brothers and PEPs with links to a Mexican drug cartel, but were connected to senior employees at Deutsche Bank.  ¶¶33, 125-26, 130-31.  They were recently charged with money laundering.  *Id.*

## III.     THE COURT SHOULD NOT TRANSFER THIS ACTION

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. §1404(a).  In deciding a motion to transfer under § 1404, courts in the Third Circuit have particularly wide discretion as they must undertake a "'flexible and individualized analysis,' balancing the factors set forth in § 1404 as well as a number of other case-specific factors" guided, in part, by *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). Ultimately, the party seeking transfer must show that the alternative venue is not only adequate, ***but also more convenient*** than the current one.  *Id.* at 879.  "This burden is a heavy one; as the Third Circuit has noted, unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail."  *In re 3M Co. Sec. Litig.*, 2020 WL 5105233, at *3 (D.N.J. Aug. 31, 2020).  Defendants failed to meet their heavy burden.

### A.     The Private Interest Factors Do Not Weigh Strongly in Favor of Transfer

#### 1.     Plaintiffs' Choice of Forum Should Be Given Some, if Not Considerable, Deference

In determining whether to transfer venue, a Court generally gives "paramount consideration" to a plaintiff's choice of venue. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *Yocham v. Novartis Pharms. Corp.*, 565 F. Supp. 2d 554, 558 (D.N.J. 2008); *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 338 (D.N.J. 2003); *Park Inn Intern., LLC v. Moody*

9

*Enters., Inc.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000) ("Some courts have held that the choice of forum by a plaintiff is considered to be presumptively correct."). Moreover, many courts give plaintiff's choice of forum particular weight in securities fraud actions. *Stepak v. Katz*, 1985 WL 5816 at *1 (E.D. Pa. Aug. 19, 1985); *Sec. Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985) ("Without question, the intent of the venue and jurisdiction provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum, and unless the balance of factors is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed"); *Sovereign Bank, F.S.B. v. Rochester Cmty. Sav. Bank*, 907 F. Supp. 123, 126 (E.D. Pa. 1995) ("the presumption in favor of plaintiff's choice of forum is even stronger in cases brought under the Exchange Act's liberal venue provision, since it represents an affirmative congressional policy choice to allow plaintiffs in securities cases the widest possible choice of forums in which to sue"); *accord*, *In re Laidlaw Sec. Litig.*, 1991 WL 170837, at *2 (E.D. Pa. Aug. 27, 1991); *Ellis v. Costco Wholesale Corp.*, 372 F. Supp. 2d 530, 537 (N.D. Cal. 2005); *Beres v. Thomas McKinnon Sec., Inc.*, 1987 WL 16977, at *3 (S.D.N.Y. Sept. 10, 1987). "If transfers were liberally granted in securities cases, court would be undermining Congress' goal of minimizing the burden on plaintiffs who are seeking to enforce federal securities laws." *Laidlaw*, at *2.

"[U]nless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed." *Lawrence v. Xerox Corp.*, 56 F. Supp. 2d 442, 452 (D.N.J. 1999); *see also Santi v. Nat'l Bus. Records Mgmt., LLC*, 722 F. Supp. 2d 602, 607 (D.N.J. 2010). Because the party seeking transfer bears the burden of proof, Defendants must show that "the proposed alternative forum is not only adequate, *but also more convenient than the present forum*." *Lawrence*, 56 F. Supp. 2d at 451; *Celgene Corp. v. Abrika Pharms., Inc.*, 2007 WL 1456156, *4 (D.N.J. May 17, 2007). Critically, to carry this burden, the Third Circuit requires *affidavits and*

10

*other documentation* establishing that the interests of justice and convenience of the parties would best be served by a transfer. *See Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 757, n.2 (3d Cir. 1973) (listing examples of required information); *see also Santomenno v. Transamerica Life Ins. Co.*, 2012 WL 1113615, at *4 (D.N.J. Mar. 30, 2012) (Salas, J.) (requiring affidavits and other materials); *Bachmann Software & Servs. v. Intouch Grp., Inc.,* 2008 WL 2875680 at *13 (D.N.J. July 22, 2008) (same). Defendants did none of this to support their motion to transfer and their request should be denied for this reason alone.

In any event, for claims arising under the Securities Exchange Act, it is not until the fraudulent statements are published to the market that a claim for securities fraud arises. *See In re Lucent Techs. Inc., Sec. Litig.*, 217 F. Supp. 2d 529, 542-544 (D.N.J. 2002). Here, the statements were published in each district in the United States, including the District of New Jersey. Thus, the securities fraud claims arose at least equally in each jurisdiction in this country. The claims arose no more in the District of New York than in the District of New Jersey. Alternatively, as explained also *infra* at 12, if the claims did not arise equally in each district in the United States, they undoubtedly arose in Germany. *In re 3M Co.*, 2020 U.S. App. LEXIS 36961, at *6 (3d Cir. Nov. 18, 2020); *see similarly Master Cutlery*, 2012 WL 6597056, at *4-5 (Hammer, J.) (examining type of claim asserted to determine locus of culpable conduct). In *3M*, the Third Circuit made clear that "*[c]laims based on false statements or omissions [for violations of the Securities Exchange Act] arise in the district where they occurred*," meaning in the district where the statements "*were issued*[.]" 2020 U.S. App. LEXIS 36961, at *6 (finding that "*All but one of those 31 alleged false statements were issued from 3M's headquarters in Minnesota*") (emphasis

11

added);[1] *accord*, *Cottman Transmission Sys. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). Here, each and every single false statement was "issued from [Deutsche Bank's] headquarters in" Germany. *See* Compl. ¶¶136-76 (reflecting that the maker of the statements was Deutsche Bank, the German parent company who is the Defendant here, and its German executives who are the Individual Defendants signing the documents that contained the false and misleading statements). Because the claims arose in Germany, this factor doesn't favor transfer.

In this respect, Defendants' misguided focus on the New York Department of Financial Services' Consent Order to bootstrap Plaintiffs' claims to New York is plain wrong under Third Circuit authority. The Consent Order **did not** resolve the claims asserted here under the Securities and Exchange Act. Applying the test **to the claims at issue in this action**, the "center of gravity" for Plaintiffs' claims is either every state in the United States, or Germany. Deutsche Bank Trust Company Americas (mentioned by Defendants in their brief and referenced in the Consent Order) is *not* a Defendant in this action. Once again, the Defendants are the foreign entities and foreign individuals that "issued" the false and misleading statements. *See*, *e.g.*, Compl. ¶¶136, 138, 141.[2]

Additionally, Deutsche Bank has a presence in this district. For example, Deutsche Bank maintained an office at Harborside Financial Center Platform, Jersey City, New Jersey, 07311 during the Class Period. Compl. ¶10. Deutsche Bank also had multiple offices throughout New Jersey during that time. *Id*. Deutsche Bank subsidiary DB Services New Jersey, Inc., located in

---

[1] The *3M* defendant was an American company headquartered in Minnesota. *Id*. at *3 There, transfer was warranted to Minnesota because "all but one of th[e] 31 alleged false statements **were issued** from 3M's headquarters in Minnesota." *Id*. at *5-6 (emphasis added). Moreover, most of the witnesses were located in Minnesota and 3M identified a nonparty witness located in Minnesota, outside the subpoena power of the District of New Jersey. *Id*. at *6-7.

[2] The New York Department of Financial Services is not the only agency investigating Deutsche Bank. At the very least, in the United States, Deutsche Bank's actions are also under the microscope of the Federal Bureau of Investigation and the Justice Department's Money Laundering and Asset Recovery Section in Washington. Compl. ¶34.

12

New Jersey, received hefty subsidies of at least $40.9 million from the State of New Jersey.[3]

Even if some "misconduct" occurred in New York (it did not), the Complaint makes crystal clear that all final decisions regarding onboarding and retention of PEPs and other high-net-worth individuals were made by Defendants—all foreign entities and individuals—in Germany. Compl. ¶¶15-21, 49, 56-60. Plaintiffs had a number of legitimate venues to choose from and they selected the District of New Jersey. Their choice should be given at least some, if not considerable, weight.

**2.    Litigation in the Southern District of New York Is Not More Convenient Than in the District of New Jersey**

In this action, the class members are scattered across the country, so the Southern District of New York is no more convenient than the District of New Jersey. *See*, *e.g.*, *Rosen v. Fid. Fixed Income Tr.*, 1995 WL 560037, *2-3 (E.D. Pa. Sept. 20, 1995). In *Rosen*, each of the defendants, entities of Fidelity Investments, were headquartered in the District of Massachusetts, and defendants sought transfer to that venue. The court noted, however, that members of the plaintiff class were residents of all fifty states and the District of Columbia. *Id*. at *3. Accordingly, the Court found, "[b]ecause it would appear that trial in either Massachusetts or the Eastern District of Pennsylvania would be equally inconvenient for the overwhelming majority of proposed class members who do not reside in either forum, I cannot conclude that the convenience of parties tilts decisively in favor of transfer to Massachusetts." *Id*.

Here, ***none of the Defendants resides in New York***. Defendant Deutsche Bank is a German bank incorporated in Germany, with its headquarters in Frankfurt, Germany. Compl. ¶14. It has subsidiaries in New Jersey and in other states. *Id*. ¶10. Likewise, the Individual Defendants all reside in Germany, with the exception of Cryan, who resides in the U.K., and each of them would

---

[3] https://dspace.njstatelib.org/xmlui/bitstream/handle/10929/34208/beip_fy2011.pdf?sequence=1 &isAllowed=y.

have to travel to either district via airplane in the event of a trial. Defendants would be hardly inconvenienced in having to travel to the District of New Jersey as opposed to the District of New York. Moreover, courts consider "the convenience of the parties as indicated by their relative physical and financial condition." *Jumara*, 55 F.3d 873 at 879. Here, none of the Defendants have indicated that they have any health concerns that would hinder their travel to the District of New Jersey for trial (as opposed to New York).

As for the convenience of witnesses, most witnesses will be located in Germany and will have to travel to U.S. for trial. This case is about false and misleading statements made by foreign Defendants. To the extent any witnesses reside in New York, they can easily traverse the short distance to New Jersey by train or car. In any event, *Jumara* considered the convenience of witnesses, "but only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Id*. at 879. Here, Defendants have not alleged that any of their employees would not be available to testify in New Jersey, and any potential witness residing in New York is within this Court's subpoena power. Fed. R. Civ. P. 45(b)(2)(B). Accordingly, the District of New York will not be a more convenient venue for witnesses than the District of New Jersey. Moreover, some non-party witnesses may be located in other states outside New York. For example, many of the Bank's AML operations are based in Jacksonville, Florida (Compl. ¶94 n.55). Neither this Court nor the District of New York would have absolute subpoena power over such witnesses, so this factor is at best neutral. Defendants also make no showing that any non-party witnesses with relevant information are unable or unwilling to attend trial in New Jersey. In any event, courts permit witnesses to appear via zoom or by other electronic means. *Mitsubishi Tanabe Pharma Corp. v. Sandoz, Inc.*, 2021 WL 1845499, at *1 (D.N.J. Apr. 7, 2021); *Xcoal Energy & Res. v. Bluestone Energy Sales Corp.*, 2020 WL 4794533, at *2 (D. Del. Aug. 18, 2020).

14

Plaintiffs anticipate that the majority of relevant documents and records are located in Germany. Even if Defendants had submitted sworn declarations attesting that all the relevant documents at issue were in New York (which they did not and cannot), "[i]n this current electronic age, it is difficult to imagine that business files cannot be produced in either forum." *Master Cutlery*, 2012 WL 6597056, at *4.

### B.      The Public Interest Factors Do Not Favor Transfer

Defendants self-servingly argue that the "bulk of Plaintiffs' claims" involves New York, but that is plain wrong.  Defendants' focus on unidentified acts in New York (presumably the onboarding and servicing of Jeffrey Epstein) is entirely misguided.  The Complaint asserts ***violations of the Securities Exchange Act***, and those violations consist of the ***misrepresentations and omission alleged in the Complaint***, not some other conduct.  *In re 3M*, 2020 U.S. App. LEXIS at *6.  Here, the false and misleading misrepresentations—***issued by foreign Defendants—were disseminated nationwide***, affecting investors in New Jersey, as well as those in New York and the rest of the states.  "Where, as here, class members reside in all fifty states and the District of Columbia, all of these jurisdictions could conceivably claim some legitimate interest in protecting its citizens from out-of-state securities merchants allegedly engaged in deceptive practices." *Rosen*, 1995 WL 560037, at *6.

Alternatively, if the false and misleading statements were not issued equally from all districts in the United States, they were certainly ***issued from Deutsche Bank's headquarters in Germany*** by the foreign Defendants.  *See In re 3M*, 2020 U.S. App. LEXIS at *6; *see also Santomenno*, 2012 WL 1113615, at *8 ("It is the breach of [the Securities Exchange Act] . . . which must be considered in determining where the center of gravity of this litigation is"), citing *NPR,*

15

*Inc. v. Am Intern. Ins. Co. of Puerto Rico*, 2001 WL 294077, at \*4 (D.N.J. Mar. 28, 2001);[4] *In re USA Techs., Inc. Sec. Litig.*, 2019 WL 4785780, at \*2-3 (D.N.J. Sept. 30, 2019) (center of gravity was Pennsylvania because the "stock fraud claims arise in the state in which the fraudulent statements were made" and the SEC filings were prepared in Pennsylvania by the company's Pennsylvania counsel, and the defendants worked out of the Pennsylvania office from which alleged misrepresentations were made); *Franklin U.S. Rising Dividends Fund v. Am. Int'l Grp.*, 2014 WL 1555133, at \*6 (D.N.J. Apr. 14, 2014) ("center of gravity" of a securities fraud action is where the alleged misstatements and/or omissions were created and transmitted); *Metro. Life Ins. Co. v. Bank One, N.A.*, 2012 WL 4464026, at \*6 (D.N.J. Sept. 25, 2012) ("[w]hen examining claims for misrepresentation on a motion to transfer venue, 'misrepresentations and omissions are deemed to occur in the district where they were transmitted or withheld, not where they are received"); *Yang v. Odom*, 409 F. Supp. 2d 599, 606 (D.N.J. 2006) (same).[5]

Here, while Deutsche Bank did have some offices in New York, as well as in New Jersey and in other states throughout the country, ***each and every misrepresentation*** alleged in the Complaint ***occurred or "was made" in Germany from the Bank's headquarters in Germany***.

---

[4] *Santomenno* involved "alleged schemes orchestrated by [defendants] in connection with [plaintiffs'] retirement services" and "logically these schemes were designed and decided upon by individuals specifically working in the Retirement Services group in Los Angeles . . . " *Id*. Plaintiffs "concede[d] that important facts to this case arose in California." *Id*.

[5] *See also In re Amkor Technology, Inc. Sec. Litig.*, 2006 WL 3857488, at \*5 (E.D. Pa. Dec. 28, 2006) ("Amkor did have offices in West Chester during the class period, but "the vast majority of events and public statements alleged in the Complaint occurred or 'were made' in Arizona from the Company's Arizona Headquarters"), *citing Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb, Inc.*, 2006 WL 1524590, at \*5 (S.D.N.Y. June 5, 2006) (However, it is well established that in securities cases "misrepresentations and omissions are deemed to occur in the district from which they are transmitted or withheld, not where they are received," and "In this case, all of the press releases and corporate filings, as well as the alleged misstatements, originated at Bausch & Lomb headquarters in Rochester), and *citing Wojtunik v. Kealy*, 2003 WL 22006240, at \*8 (E.D. Pa. 2003) (securities fraud claim "arose" in the state where "SEC filings and alleged misrepresentations were made").

16

Under Supreme Court precedent, only a "maker" of a statement is liable for a violation of the Securities and Exchange Act. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-143 (2011); *Allegheny County Employees' Ret. Sys. v. Energy Transfer LP*, 2021 WL 1264027, at *20 (E.D. Pa. Apr. 6, 2021) (the CEO "is one of the alleged speakers in the 10-K filings with the SEC, as he signed those documents"). If any of the statements were "made" in New York (they were not), a fortiori a Deutsche Bank entity or individual must be found to have "made" the statements. Accordingly, this factor doesn't favor Defendants and is, at best, neutral.

Defendants accuse Plaintiffs of "forum shopping." (Defs' Br. at 22). But, as explained above, Plaintiffs have a nexus to this state: Defendants' dissemination of false and misleading statements *in this district*.[6] Defendants' assertion that this case is a "carbon copy" of *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ("*In re DB*") is bogus. This case involves a different class period (March 2017-May 2020 vs. Jan. 2013-July 2016); different plaintiffs; a different class of investors; different factual allegations; different legal issues; and different damages. These significant differences will affect each and every element of Plaintiffs' Exchange Act claims. Plaintiffs here must plead and prove a completely different case than plaintiffs did in *In re DB*. Although the different complaint in *In re DB* was dismissed, the complaint in this action should survive.[7] Regardless, "attempting to achieve tactical advantage in the choice of a forum . . . is a perfectly legitimate goal in an adversarial system of justice." *True Health Chiropractic Inc. v. McKesson Corp.*, 2013 WL 6000539, at *4 (N.D. Cal.

---

[6] The selection of an advantageous forum by a plaintiff is a routine and uncontroversial aspect of federal court litigation. *In re Coudert Bros. LLP* , 673 F.3d 180, 189 (2d Cir. 2012) ("inter-state forum shopping has come to be perceived less as a necessary evil of federalism and more as a right to be enjoyed by plaintiffs and protected for their benefit").

[7] *Green v. Deutsche Bank Aktiengesellschaft*, 2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019) ("*Green*") is even further afield. *See infra* at 25.

17

Nov. 12, 2013) (no forum shopping where plaintiff was not the same plaintiff in prior case, so plaintiff "was not escaping a prior unfavorable ruling *in its own case*"); *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779 (1984) (plaintiff's selection of forum with longest statute of limitations was permissible and "no different from the litigation strategy of countless plaintiffs who seek a forum with favorable substantive or procedural rules or sympathetic local populations."); *see also Shutte*, 431 F.2d at 22.

Defendants' motive is clear: they prefer to defend themselves in another forum where they hope to escape liability. But §1404 is not a statute meant to defeat a plaintiffs' choice of forum. *See Atlantic Marine Constr. Co., Inc. v. United States Dist. Court for the W. Dist. Of Texas*, 134 S. Ct. 568, 581 (2013) ("[P]laintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations)."); *Van Dusen v. Barrack*, 376 U.S. 612, 633-34 (1964) ("There is nothing . . . in the language or policy of section 1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs who have chosen a forum which, although it was inconvenient, [i]s a proper venue"). Allowing parties to use transfer to obtain a change of law would be "startling." *Id*. at 636 ("The legislative history of §1404(a) certainly does not justify the rather startling conclusion that one might 'get a change of law as a bonus for a change of venue.'"). The Court should reject Deutsche Bank's attempt to use the transfer statute to find a more favorable forum to dismiss this case. *See*, *e.g.*, *True Health Chiropractic Inc. v. McKesson Corp.*, 2013 WL 6000539, at *4 (N.D. Cal. Nov. 12, 2013) ("[t]he Court is not persuaded that Plaintiff is any guiltier of forum shopping than [defendant] is . . . It seems just as likely that McKesson would rather be in front of a judge it likes as that Plaintiff wants to be in a federal district it likes").

As for other public factors, "there is little significant difference in enforcing a judgment in

18

one federal forum than in another." *E'Cal Corp. v. Office Max, Inc.*, 2001 WL 1167534, at \*4 (E.D. Pa. Sept. 7, 2001). And the "relative congestion of the respective courts' dockets is not a factor of great importance in this type of motion." *Bank United, NA v. GC of Vineland, LLC*, 2020 WL 3453817, at \*5 (D.N.J. May 28, 2020), *report and recommendation adopted sub nom.*, *Bank United, NA. v. First Chatham Bank*, 2020 WL 3452152 (D.N.J. June 23, 2020) (Salas, J.). Moreover, Defendants have made no showing that the proposed transferee court's familiarity with the governing law favors transfer. Generally, where a case is governed by a federal statute, any federal district court should be "well-versed in the governing law." *Cohn v. Metro. Life Ins. Co.*, 2007 WL 1573874, at \*5 (May 31, 2007).

Importantly, Defendants have ***waited more than eight months*** from the date they made an appearance in this action to move to transfer. Such dilatory conduct undermines their motion. Had Defendants truly considered this District so inconvenient as to merit a transfer, they should have moved immediately. Indeed, judicial resources have been wasted and Plaintiffs have been forced to oppose Defendants' motion to dismiss on the merits under the law of the Third Circuit.

For all the foregoing reasons, the Court should deny Defendants' motion.[8]

## IV. THE COMPLAINT PLEADS SECURITIES EXCHANGE ACT VIOLATIONS

### A. Applicable Pleading Standards Do Not Favor Dismissal

To state a claim under §10 (b), a plaintiff must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009). The Supreme Court specified that "the court's job is not to scrutinize each allegation in isolation but to

---

[8] The authorities cited by Defendants are inapposite, and represent little more than cherry-picked cases involving specific factual scenarios, not present here.

19

assess all the allegations holistically" after accepting all factual allegations as true. *Tellabs*, 127 S. Ct. at 2511. Defendants challenge only the pleading of material falsity and scienter. As discussed below, the Complaint pleads these elements.

### B. The Complaint Pleads Materially False and Misleading Statements and Omissions

#### 1. Defendants' Representations Are Actionable

"A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d at 543. Throughout the Class Period, Defendants made false and misleading statements about the Bank's KYC processes, a critical part of the Bank's AML procedures. For example, Defendants repeatedly assured investors that Deutsche Bank has "developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance," and insisted that "[o]ur KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews." Compl. ¶¶ 141, 156, 171. Defendants similarly claimed that the Bank's "robust and strict" KYC program "includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships," with "[s]pecial safeguards . . . implemented for . . . politically exposed persons . . . [PEPs]" *Id*. ¶¶143, 158, 173. In truth, Defendants repeatedly exempted high-net-worth individuals and PEPs from any meaningful due diligence, enabling their criminal activities through the use of the Bank's facilities. *Id*. ¶5. There were, in reality, no "special safeguards" implemented for PEPs and clients such as Epstein were treated as "Honorary" PEPs excused from meaningful KYC processes. *Id*. ¶¶5, 100, 144, 159. Far from "minimiz[ing] risks" related to money laundering, financing of terrorism, or other crimes, Deutsche Bank was facilitating such crimes by lending money, holding and servicing the accounts of unsavory clients

20

engaged in criminal activities.  *Id*. ¶¶142, 157, 172.  A reasonable investor would have been misled by Defendants' statements, which conveyed the false impression that the Bank was complying with and implementing robust KYC procedures, particularly with respect to PEPs and other high-risk clients when, in reality, the Bank exempted them from any meaningful due diligence.

For instance, in *Jaroslawicz*, 962 F.3d at 710-17, the Third Circuit reversed the dismissal of claims arising from misleadingly incomplete risk warning statements that failed to disclose the actual weaknesses present in the bank's AML and consumer compliance programs.  The company represented  that "[a]lthough [the bank] seeks to mitigate operational risk through a system of internal controls . . . no system of controls . . . is infallible," any "[c]ontrol weaknesses or failures . . . could result in . . . harm to [the bank's] reputation," and "singled out that determining the effectiveness of its BSA/AML program would be crucial to obtaining [merger] approval."  *Id*. at 713-14.  The Third Circuit found these and similar statements to be false and misleading, because they "omitted company-specific detail about its compliance program."  *Id*.  The Court found that the undisclosed "malpractice," *i.e.*, offering free checking, then switching customers to accounts carrying fees, "cast doubt on [the bank's] controls and compliance systems."  *Id*. at 715.  Similarly, in *Shapiro*, 964 F.2d at 276, the Third Circuit reversed dismissal of claims based, *inter alia,* on statements of "conservative underwriting standards," a "lending philosophy which emphasizes the prompt identification and follow-up of problem loans and a conservative approach to problem loan recognition," and assurances that defendant "carefully monitors [its] portfolio" because such representations could have misled a reasonable investor.

In *In re Cognizant Technology Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at *2-13 (D.N.J. June 5, 2020) (Salas, J.), Judge Salas agreed with Judge Walls' holding that statements related to the effectiveness of the company's anticorruption training, *i.e.*, that the company

21

"delivered" certain hours of Code of Ethics training, were misleading in light of an undisclosed bribery scheme.   Likewise, in *Urbach v. Sayles*,  1991 WL 236183, at *1 (D.N.J. Sept. 4, 1991), the court sustained claims based upon false statements as to defendants' purported "careful underwriting of loans" and "continuous and scrupulous monitoring of outstanding loans." *See also In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *9–11, 17-18, (D.N.J. Mar. 21, 2019) (finding actionable statements about compliance with standards and regulations, de-risking and risk assessment, and "robust"  implementation and verification of a preventive action plan); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) (finding statements concerning "rigorous" and "consistent" practices actionable); *Marsden v. Select Med. Corp.*, 2006 WL 891445, at *6 (E.D. Pa. Apr. 6, 2006) (statements regarding "regulatory monitoring and compliance efforts" were actionable); *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (finding statements actionable when they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable" regulations); *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 258, 271–72 (2d Cir. 2020) (reasonable to assume that a disclosure about conflicts of interests would harm Goldman's reputation, thus it is "difficult to imagine that Goldman's shareholders would have been indifferent" to such information, particularly where Goldman told investors that "[o]ur reputation is one of our most important assets").

Still, Defendants contend that their representations regarding the Bank's KYC steps are nothing but immaterial, aspirational statements. (Defs' Br. at 25-30).[9]  They are wrong.  As

---

[9] Defendants' cases are inapposite.  The court in *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716-18 (3d Cir. 2019) found that, far from obscuring the facts the complaint alleged were undisclosed, the company made "clear and consistent" disclosures about those precise facts to investors.  The court in *Ieradi v. Mylan Labs. Inc.*, 230 F.3d 594, 599-600 (3d Cir. 2000) found that investors were

explained above, courts reject such challenges to statements that positively characterize banking practices and efforts to manage risks, as here.  The Third Circuit is clear that "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.'" *Shapiro,* 964 F.2d at 282.  "For example, if a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id*; *see also Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1092-93 (1991) (even "conclusory" terms like "high" or "fair," when used in certain context, are "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) (statements about conservative underwriting and responsible lending practices were actionable); *In re RAIT Fin. Tr. Sec. Litig.,*, 2008 WL 5378164, at *5-6, n.12 (E.D. Pa. Dec. 22, 2008) (statements that "underwriting involves extensive due diligence process" and that the company has a "disciplined underwriting process and recurring credit analysis" were not mere puffery, where plaintiffs alleged that defendants did not conduct any meaningful analysis); *In re U.S. Interactive, Inc.*, 2002 WL 1971252, at *16 (E.D. Pa. Aug. 23, 2002) (statements concerning  "robust" demand actionable); *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (defendants' "comforting [oral] statements . . . about compliance measures . . . could be found by a trier of fact

sufficiently on notice that the Federal Trade Commission could bring an antitrust action against the company because it disclosed the FTC investigation and the nature of the investigation.

to be . . . misleading.").  These opinions hardly stand alone.[10]

Here, Defendants' representations that the Bank was implementing "special safeguards" for PEPs, with "intensive checks," "strict identification requirements, name screening procedures and the ongoing monitoring and regular review" of all the existing client relationships, that it had "effective procedure for assessing clients [via its KYC processes]" and "comprehensive compliance" that "minimize[d] risks relating to money laundering, financing of terrorism and other economic crimes" were material to investors.  By exempting PEPs and other high-risk individuals from any meaningful KYC procedures, the risk to the Bank's reputation and the risks of criminal and civil liability were significantly heightened.   The materiality of Defendants' statements is also demonstrated by Defendants' repeated discussion of these topics throughout the Class Period.  *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997) (noting repeated statements on a topic "created the reasonable understanding among investors" that the company "attached considerable significance" to the topic); *Shapiro,* 964 F.2d at 282 (same).

It is black letter law that a determination as to whether a statement is false and misleading always depends on context.  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005); *Jaroslawicz*, 962 F.3d at 713-14.  The cases on which Defendants rely are inapposite.  As explained above, *In re DB* involved a different class period; different plaintiffs; a different class of investors;

---

[10] *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (emphasizing improvements of particular business operations that, in reality, also suffered deficiencies was actionable); *Prudential v. Goldman, Sachs*, 2013 WL 1431680, at *7 (D.N.J. Apr. 9, 2013) (representations about mitigating "credit risk" were actionable); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d at 558 (rejecting defendants' contention that statements, including about "robust" demand for products, were puffery); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *14 (E.D. Pa. July 27, 2005) (statement about defendants' "disciplined underwriting" was not puffery); *Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) ("characterizations of MF Global's risk management system" as "robust" are actionable); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("state[ments] that the inventory situation was 'in good shape' or 'under control' . . . were plainly false and misleading").

24

different factual allegations; different legal issues; and different damages.  There, the district court found that "Plaintiff alleges neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements nor facts showing that the processes were not followed."  *Id*. at *7.  (The Second Circuit affirmed on scienter grounds, not material falsity.)  Here, in contrast, the Complaint specifically alleges facts showing that "the descriptions of the processes were false or misleading" and also that "the processes were not followed" because Deutsche Bank exempted PEPs and other high-risk clients from any meaningful KYC procedures.  Similarly, *Green*—a case litigated *not by the Pomerantz Law Firm, but by different counsel*—[11]involved alleged misstatements about the company's controls over financial reporting, but the court found that the claims did not relate to financial reporting; instead, they concerned the bank's inability to value collateral that backed loans.  *Green*, 2019 WL 4805804 at *1-2.  Here, the false and misleading statements directly relate to the underlying misconduct.  *See, e.g.*, Compl. ¶¶141, 143 (discussing misleading statements directly related to the Bank's KYC procedures for assessing clients, including PEPs).  Similarly, *Hall v. Johnson & Johnson* observed that "value-oriented statements regarding" a company's "commitment to consumer safety" were not actionable because they did not address the misconduct at issue and were hopelessly general, but *did* find actionable statements of the ilk made here.  2019 WL 7207491, at *15-16.  Likewise, *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG* involved general statements that were "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  752 F.3d

---

[11] *Green,* 2019 WL 4805804 (Dkt. No. 39).  Indeed, multiple law firms filed motions for lead counsel appointment in *In re DB* and *Green*, prompted in part by regulators sanctioning the Bank. *Green*, 2019 WL 4805804 (Dkt. Nos. 9, 12, 15); *In re DB*, 2017 WL 4049253 (Dkt. Nos. 20, 22, 25, 28, 31).

173 ,183 (2d Cir. 2014).  No such statements are involved here.[12]

### 2.    Defendants' Truth-on-the-Market Defense Fails

Defendants baldly claim that "the investing public was provided with more than enough information to understand the state of Deutsche Bank's AML and KYC processes."  To prevail on this "truth-on-the-market" defense, Defendants must establish that, during the Class Period, corrective information revealing the actual truth was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."  *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199 at *35 (D.N.J. Aug. 8, 2011); *Ganino v. Citizens Utilities Co.,* 228 F.3d 154,167 (2d Cir. 2000).  This defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint."  *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015); *Ganino*, 228 F.3d at 167.  Even on summary judgment, a defendant invoking a "truth on the market defense" bears "a heavy burden of proof."  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1993) ("Summary judgment is proper only if [movants] show that 'no rational jury could find' that the market was misled.") (citation omitted).  Defendants fail to meet that burden.

In conducting their due diligence into Deutsche Bank, Plaintiffs were alerted by a confidential witness to a January 2017 Settlement Agreement between Deutsche Bank and the

---

[12] Nor are Defendants' unqualified statements ones of opinion.  Defendants did not preface them with words like Deutsche Bank "believes" or "thinks."  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund et al*, 135 S. Ct. 1318, 1325 (2015) ("Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not").  Regardless, "a reasonable investor may . . . understand an opinion statement to convey facts about how the speaker has formed the opinion— or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead the audience."  *Id*. at 1328; *see also In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig*., 2015 WL 2250472, at *24 (D.N.J. May 13, 2015); *In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008), *aff'd sub nom.*, *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010); *Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *14 (D.N.J. Apr. 28, 2017).

U.K. Financial Conduct Authority ("British Authority"). That Agreement contained an assessment made in 2015 by the British Authority, which found "serious deficiencies in Deutsche Bank's AML control framework and serious CDD [customer due diligence], EDD [enhanced due diligence], and ongoing monitoring failings." Compl. ¶¶74-75. Upon reviewing a sample of the Bank's customer files, the British Authority found that "almost all of the higher risk files [they reviewed] had inadequate EDD, with deficiencies such as: limited evidence of meetings with customers; and inappropriate disregarding of negative press coverage." *Id*. ¶75. These findings, which the British Authority discussed with the Bank in late 2016 and early 2017, make crystal clear that Defendants were unquestionably aware before the commencement of the Class Period of the existence of troubled accounts. *Id*. ¶76. Despite these significant red flags, Defendants issued comforting statements that gave investors the false impression that during the Class Period:

> the Bank had "developed effective procedures for assessing clients (Know Your Customer or KYC)" to "facilitate comprehensive compliance," with "intensive checks" that "continue[d] in the form of regular reviews," minimizing "risks relating to money laundering, financing of terrorism and other economic crime," and was applying "strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships," with "special safeguards" for "business relationships with politically exposed persons (PEPs) and clients from countries or industries deemed high risk."

*Id*. ¶¶156, 158. These statements directly contradicted what was happening behind closed doors at Deutsche Bank. Defendants' argument that the information identified by the British Authority gave investors everything they needed to know about Deutsche Bank's KYC processes during the Class Period is absurd. Deutsche Bank's Settlement with the British Authority said ***nothing*** about the Bank's KYC practices ***during*** the Class Period, *i.e.*, ***between 2017 and 2020***. To the contrary, during the Class Period, Defendants consistently represented to investors that Deutsche Bank was implementing strict KYC procedures. Indeed, when in August 2018 *Reuters* reported that internal confidential reports of Deutsche Bank dated June 5 and July 9, 2018 found that the Bank's KYC

27

processes were severely deficient, Deutsche Bank flatly denied those stories. Compl. ¶¶70-73. In a written public response to *Reuters*, Deutsche Bank rejected the notion that its KYC processes were not effective and doubled-down on its continued misrepresentations that "Our procedures to identify potential anti-money laundering and KYC risks are very effective." *Id.* ¶73. At no point during the Class Period did investors learn that Deutsche Bank's top echelon—the very individuals who investors expected to be the stewards of AML prevention—permitted or actively participated in skirting KYC procedures.

In light of these denials and misrepresentations, Defendants' affirmative defense falls flat. *See Merck*, 2011 WL 3444199, at *17 (rejecting truth-on-the-market defense because even though cardiovascular risk data was disclosed, defendants "consistently sought to reassure the market that the risk was minimal"); *In re Enzymotec* , 2015 WL 8784065, at *15 (defense failed where defendants "repeatedly and directly obfuscated the impact" of countervailing information); *In re EQT Corp. Sec. Litig.*, 2020 WL 7059556, at *13 (W.D. Pa. Dec. 2, 2020) (rejecting truth-on-the-market defense where some information in the public domain was denied by defendants); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) (qualitative statements about user growth actionable despite disclosure of accurate user data); *U.S. SEC v. Mudd*, 885 F. Supp. 2d 654, 666-67 (S.D.N.Y. 2012) (publication of "extensive credit metrics" for loan portfolio did not counteract misleading statements about subprime exposure); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (finding that while news articles, a complaint describing alleged conflicts of interest, and disclaimers in defendant's research reports raised some concern in the market about defendant's alleged conflicts, the information was counteracted by defendants' statements that its research was of high quality, independent, and objective).

The supposedly "self-disclosed shortfalls" Defendants made ***during*** the Class Period are

28

hopelessly general and did not disclose the Bank's exemption practices. *See Jaroslawicz*, 962 F.3d at 713-17 (requiring specific disclosure of the "noncompliance" practice). Defendants seek to sidestep liability by claiming they represented that "[w]e have identified the need to strengthen our internal control environment . . . Both our internal control environment and the infrastructure that underlies it fall short in a number of [unspecified] areas and are not well integrated across the Bank" and there are "inherent limitations to the effectiveness of any control system, including disclosure controls and procedures." (Defs' Br. at 29-30). How can a reasonable investor understand from these vague statements that Deutsche Bank was actively exempting PEPs and other high-risk clients from proper KYC procedures? Quite the opposite, during the Class Period Defendants were vouching that "special safeguards" were implemented for PEPs and other high-risk clients, with "intensive checks" and "regular reviews" to "facilitate comprehensive compliance." Compl. ¶¶141, 156, 171.[13]

Moreover, Defendants' contention that the misconduct was known to the market during the Class Period, and therefore immaterial to investors, cannot be squared with the market's reaction when the truth was finally revealed at the end of the Class Period. On this news, Deutsche Bank's price plummeted over 35% through a series of corrective disclosures. ¶¶179, 181, 183, 188, 191, 193, 195, 197, 199, 201; *see Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 660-61, n.11 (4th Cir. 2004) ("majority rule" is that a stock price drop in response to a corrective disclosure is "some evidence" of materiality) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997)); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014)

---

[13] Deutsche Bank's professed "disclosure" before the Class Period of misconduct that occurred outside the Class Period related to equity trades in Moscow and London, and to trading of CO2 emission rights (Defs' Br. at 29), after the bank's wrongdoing was exposed by third parties, deals with misconduct that is *not* the subject of the Complaint and cannot immunize Defendants.

(stock drop "belies any suggestion that investors found the defendants' statements immaterial"); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *30 (D.N.J. Dec. 31, 2018) (finding materiality from 11% decline under Third Circuit rule that "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock" (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 589 (D.N.J. 2001) ("[S]ignificant change in a stock's price may be determinative of whether a statement or omission was material."). Notably, no Defendant has moved to dismiss on loss causation grounds.[14]

### 3. The Complaint Pleads Actionable Omissions

Defendants assert that "Deutsche Bank had no duty to disclose" that it was exempting PEPs and other high-risk clients from due diligence because "it already reported all relevant material information in the robust disclosures in its filings" (Defs' Br. at 32-33). That contention is baseless. *See supra* at 26-30. Moreover, once Defendants chose to speak about their KYC processes, claiming to employ "special safeguards" and other procedures for PEPs and other high-

---

[14] Defendants also contend that they made "fulsome disclosures" because they supposedly issued "warnings" that Deutsche Bank "*may* be unable to complete [*unspecified*] initiatives as quickly [as intended] . . . and [its] efforts may be insufficient to remediate existing [*unspecified*] deficiencies. (Defs' Br. at 31). This argument fails. First, only forward-looking statements are protected by cautionary language. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000). None of the challenged statements are forward-looking. Second, the purported language Defendants cite as cautionary was clearly vague. Cautionary language must be extensive, specific, and directly related to the alleged false statements and omissions. *Id*.; *accord*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010); *Jinkosolar*, 761 F.3d at 251 (2d Cir. 2014); *see similarly In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *8 (D.N.J. Oct. 27, 2005) ("specific and tailored substantive language" is required). Defendants' purported "warnings" did not even mention due diligence, let alone disclose that exemptions were made for PEPs, so any such "warnings" were insufficient. *See Jaroslawicz,* 962 F.3d at 713-17 (requiring specific disclosure of the "non-compliance" practice); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709-10 (3d Cir. 1996). In any event, "[t]he question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on [a] motion to dismiss." *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d at 557.

risk clients, they had a duty to disclose that they exempted several high-profile criminals from any due diligence. The Third Circuit recognizes a duty to disclose when there is "an inaccurate, incomplete or misleading . . . disclosure." *Oran* 226 F.3d at 285-286 (emphasis added); *see also In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading."); *accord*, *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir. 1989); *Berkowitz v. Conrail, Inc.*, 1997 WL 611606, at *14 (E.D. Pa. Sept. 25, 1997) (same). As the Court in *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004 (D.N.J. Aug. 17, 2005), stated, "even an objectively true statement, if it leaves out material information, may be actionable: '[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects.'" *Id*. at *22 (citations omitted); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading") (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490-91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated")); *Shapiro*, 964 F.2d at 282 (subject is "in play" where a defendant mischaracterizes company practices).

### 4.    The Complaint Alleges Misrepresentations, Not Mismanagement

Defendants also argue that the Complaint fails to plead that the statements were false when made, claiming instead that at most the Bank engaged in mismanagement. Not so. While the Complaint does not dispute that the Individual Defendants mismanaged Deutsche Bank, Plaintiffs' claims arise from material misrepresentations and omissions, not the fact of mismanagement.

31

*Ravens v. Republic New York Corp.*, 2002 WL 1969651, at *9 (E.D. Pa. Apr. 24, 2002) ("While recognizing that the federal securities laws do not regulate internal corporate mismanagement, we are satisfied that a claim that Defendants failed to disclose material facts is actionable . . . ."). "[A] complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992). Allegations of material omissions are "not encompassed within the exception to liability for failure to disclose corporate mismanagement." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 926-927 (D.N.J. 1998). Where a corporation speaks in half-truths, even about internal mismanagement, those statements give rise to a securities fraud claim. *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *8 (E.D. Pa. July 27, 2005); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 355 (S.D.N.Y. 2006) (false statements may be actionable "even when those material facts relate to corporate mismanagement").[15] The serious allegations here extend far beyond mismanagement and concern knowingly onboarding and servicing individuals engaged in criminality—issues that go to the

---

[15] Defendants' authorities are inapposite. In *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018), the Third Circuit merely affirmed the district court's finding that one particular statement revealed mere mismanagement instead of misconduct. That statement was an "admission" of "inappropriate tone at the top" of a restatement, which was explicitly linked to the CEO's management style, and the court specifically found that the "use of the word 'tone' . . . is referring to management style." *Id*. None of these facts are present here. Indeed, the *Hertz* Court recognized that mismanagement supports an inference of scienter when a complaint alleges that a defendant was aware of mismanagement but failed to disclose it. *Id*. at 118. Similarly, in *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *13 n.15 (D.N.J. Apr. 30, 2020), the court observed in a footnote that certain statements were not actionable "to the extent that they [were] intended to demonstrate that [the] . . . investments were 'egregiously wasteful related-party transactions.'" And in *In re Magnum Hunter Resources Corp. Sec. Litig.*, 26 F.Supp.3d 278, 295, 297 (S.D.N.Y. 2014), another restatement case, the court found mismanagement because the misconduct involved mere accounting "errors" triggered by the company's rapid growth.

heart of compliance with laws and regulations, and corporate integrity.

### C.    The Complaint Pleads Scienter

Scienter may be established either by showing conscious misbehavior or recklessness, and can be satisfied by circumstantial evidence.  *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 WL 3705801, at *15-16 (D.N.J. Aug. 28, 2017); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 n.8 (3d Cir. 2013) ("Documentary evidence is not required").  The inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences." *Tellabs,* 127 S. Ct. at 2510*.*  Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  The Court, in determining whether the Complaint alleges facts giving rise to a strong inference of scienter, must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509.  Scienter of executives acting within the scope of employment is imputed to the corporation.  *Carmack v. Amaya Inc.*, 2017 WL 2610673, at *9 (D.N.J. June 15, 2017).  The detailed allegations of the Complaint, when considered together, give rise to a strong inference of scienter.

#### 1.    The Specific Findings of the British Authority and Deutsche Bank's Own Audits Support a Strong Inference of Scienter

As discussed above, ***before*** the beginning of  the Class Period, Defendants knew that Deutsche Bank's high-risk client files ***lacked any due diligence documentation, with deficiencies such as limited evidence of meetings with the high-risk customers and an entirely inappropriate disregarding of negative press coverage***.  Compl. ¶75.  These findings were the result of the British Authority's review of a sample of Deutsche Bank files, which commenced in 2015 and was

33

mentioned in a January 2017 settlement agreement between the Bank and the British Authority. *Id*. ¶74. Deutsche Bank met with the British Authority on several occasions, including in late 2016 and early 2017, to discuss those issues. Despite those red flags, during the Class Period Defendants, at least with utter recklessness, published misleadingly comforting statements, claiming that Deutsche Bank was applying "special safeguards" for PEPs, with "intensive checks" and "ongoing monitoring and regular review" of all existing relationships with "effective [KYC] procedures." *See supra* at 3; *see also Energy Transfer*, 2021 WL 1264027, at \*24-25 (red flags related to regulatory noncompliance and government investigations support a strong inference of scienter); *In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 503-04 (S.D.N.Y. 2011) (finding scienter where defendants disregarded SEC warnings about risk and valuation models); *Lewis v. Straka*, 2006 WL 2927658, at \*6 (E.D. Wis. Oct. 12, 2006) (awareness "of the bank regulators' warnings regarding the problems in [corporation's] loan portfolio and with its lending practices" gave "rise to a strong inference" of scienter).

Moreover, during the Class Period, *Reuters* reported the existence of two Deutsche Bank internal audit reports dated June 5 and July 9, 2018, which showed significant KYC deficiencies, with a "pass rate of zero percent" for client processing in countries such as Russia and South Africa. Compl. ¶¶70-71. Reportedly, the Bank's executives met with the European Central Bank in late July 2018 to discuss the findings. *Id*. ¶72. Importantly, Deutsche Bank *publicly denied* any KYC deficiencies and directly contradicted the *Reuters* report, insisting that its KYC procedures "are very effective." *Id*. ¶73. These allegations cement an inference of scienter. *See*, *e.g.*, *Avaya*, 564 F.3d at 269 (denials contribute to inference of scienter); *Energy Transfer*, 2021 WL 1264027 at \*24-25; *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at \*10 (D.N.J. Dec. 30, 2019) (red flags from audits and government complaints support inference of scienter); *In re Eletrobras Sec.*

34

*Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (scienter where internal audits highlighted problems with the company's internal controls, and the audits were sent to the board of directors, whose members included defendant); *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *8 (D. Del. Feb. 7, 2020) (scienter where the complaint alleged that Defendants were shown negative internal reports).

Furthermore, CW3, the Vice President/AFC Principal Auditor of Sanctions and Embargoes, part of Deutsche Bank's Group Audit, explained that ***three internal critical audit findings during the Class Period—which were concealed from investors***— showed that (i) the Bank was "not going through the right protocols to onboard" clients, specifically high-net-worth, Wealth Management clients, who were not vetted; (ii) the Bank was onboarding and servicing companies and clients that were sanctioned in the United States through the "back-door"; (iii) and the Bank was conducting "wire stripping, a "type of money laundering" in which the Bank allowed high-net-worth individual clients (including several princes from the Middle East) and corporation clients to wire funds, for example, in the United States, indirectly through other countries in order to avoid sanctions and avoid being traced. Compl. ¶¶61-63. CW3 explained that Deutsche Bank's Global Head of Audit Group and Chief Auditor Max Ng was copied on the audit reports. *Id*. ¶64. According to CW1, as a matter of practice Ng would have reported any audit results to Deutsche Bank's CEO. *Id*. Ng was also known to be a close ally of Defendant Sewing. *Id*.

Likewise, CW5, Vice President of Group Audit during the Class Period, recalled that during his/her tenure at Deutsche Bank, including in 2017 and 2018, there were several "critical audit findings" showing that the Bank failed to identify and trace the source of wealth for high-net-worth clients. *Id*. ¶¶27, 67. CW5 explained that Deutsche Bank's Global Head of Group Audit, who until November 2018 was Mark Cullen, had access to the findings. *Id*. Cullen reported

directly to Defendant Sewing. *Id*. In addition to Cullen, Steve Morcombe, the Director of Deutsche Bank's Group's COO Asset & Wealth Management Technology Office, also had access to the findings. *Id*. CW6, Vice President/Head of AFC Risk Analysis during the Class Period, similarly recounted that his/her team frequently presented concerns about the sources of funds of oligarchs and about their questionable business practices during Risk Identification Forums, up to and including October 2020. *Id*. ¶¶28, 68. Another witness, CW7, who conducted AML audits of Wealth Management clients during part of the Class Period, said that s/he did not recall the Bank's Wealth Management division ever turning away a client." *Id*. ¶¶29, 69.

Defendants largely ignore these critical allegations, which leave no room for doubt as to Defendants' scienter *in this case*. Instead, Defendants fixate on *In re DB,* but that case is inapposite. There, unlike here, the plaintiffs attempted "to imply scienter by drawing a connection between the Russia mirror trades [*at issue in that case, but not here*] and prior governmental investigations" that were *entirely unrelated* to the mirror trading at issue and were "*not central to Plaintiffs' claims*." 2017 WL 4049253, at *1-2, 8 (emphasis added). Critically, in affirming the district court's decision on scienter grounds, the Second Circuit found that the consent order addressing the mirror trading scheme specifically mentioned that "***no concerns relevant to the suspicious trading activities were ever escalated out of Moscow***" and ***no other regulatory reports or findings put defendants on notice of any deficiencies concerning the alleged scheme***. *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 58–59 (2d Cir. 2018) (emphasis added). Here, in stark contrast, specific findings, including evidence in Deutsche Bank's own internal audit reports, put Defendants squarely on notice of KYC deficiencies related to the Bank's wealthy clients. What's more, not only were the Individual Defendants placed on notice of these significant failings, but also are alleged to have been actively involved in circumventing KYC

36

safeguards by onboarding, retaining, or facilitating the Bank's relationship with PEPs and other high-risk clients.[16]

### 2. Additional Direct and Circumstantial Evidence Strongly Supports Defendants' Scienter

As a matter of practice, Deutsche Bank's top brass was and is involved in the approval and retention of PEPs and other high-risk clients. As aforementioned, CW1 explained that at Deutsche Bank, as a general rule, the more notorious a person becomes, the higher up the corporate ladder any decision-making process will be taken. *Id*. ¶49. According to CW1, in the case of really notorious Russian oligarchs and the like, the onboarding and retainer of such clients only happened with the approval of the highest-level authorities: the CEO, the COO, and Deutsche Bank's Board. *Id*. *See also supra* at 3. CW1 explained that Epstein, in particular, was discussed at Deutsche Bank's Board level. *Id*. At all times, the CEO and CFO of Deutsche Bank were Board members. Compl. ¶¶15-18. Jan Ford, Deutsche Bank's Americas Head of Compliance, who was also a member of Deutsche Bank's Global Compliance Executive Committee, also approved Epstein's continued retention as a client as "business as usual" given the "number of sizable deals" he was generating, despite knowing that "40 underage girls had come forward with testimony of Epstein sexually assaulting them." Compl. ¶¶83-91.

---

[16] Defendants' other cases (Defs' Br. at 36-37) are wholly inapposite. *Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007) concerned a company's prompt disclosure to investors of revised preliminary cost estimates upon learning that the facility in question would cost more to renovate. *Id*. at 328. *Kumar v. Kulicke and Soffa Industries, Inc.*, 2019 WL 5081896 (E.D. Pa. Oct. 9, 2019) involved genuine attempts to fix mistakes or errors as a result of misconduct by one rogue employee, and the company promptly publicly disclosed the misconduct upon its discovery. Similarly, *Messner v. USA Technologies, Inc.*, 2016 WL 1466543 (E.D. Pa. Apr. 13, 2016), which involved GAAP accounting, was devoid of any alleged "red flags" that would have alerted defendants of the "small balance uncollectible accounts," and the company, "unprovoked by government investigation," promptly disclosed the mistake." *Id*. at *7-11. Indeed, the court underscored that if defendants "tried and repeatedly failed to correct the error, it may be a different story and would be more comparable to [inferring scienter]." *Id*. at *11.

During the Class Period, Deutsche Bank's KYC procedures were overseen by the Board, who worked closely with the Bank's Group Audit. *Id.* ¶20. Defendant Cryan, for example, became personally involved with a 2016 SAR filed by Bank of America on Deutsche Bank. *Id.* ¶59. Bank of America informed the U.S. government that certain transactions facilitated by Deutsche Bank involved the "suspicious designation of beneficiaries" and "suspicious EFT/wire transfers." *Id.* The SAR specifically mentions Defendant Cryan, as well as Paul Achleitner, the Chairman of Deutsche Bank's Supervisory Board, having interacted with Bank of America on the matter. *Id.*

According to CW1, Deutsche Bank's Reputational Risk Committee/Group Risk Committee routinely overturned decisions by the U.S. Reputational Risk Committee, with Deutsche Bank's CEO's involvement. *Id.* ¶56. CW2 similarly explained that during the Class Period, the Head of AFC for the Americas, Richard Weber, was routinely overruled by Deutsche Bank's Board in Frankfurt. *Id.* ¶¶57-58. Specifically, Weber would say "no" to onboarding specific new clients or approving loans to suspicious individuals or entities, but Deutsche Bank's Board would still approve the new clients and loans despite Weber's objections. *Id.* ¶58. "Issues would come up—red flags all over the place—and the board would approve it [anyway]. They turned a blind eye to everything," said CW2. *Id.* In one particular instance around April 2018, the U.S. Reputational Risk Committee had blocked the sale of Deutsche Bank's stake in an office complex to a controversial Russian PEP, Vitaly Yusufov, whose father was a Bank client. *Id.* ¶57. According to CW1, it was common knowledge within Deutsche Bank that German prosecutors were probing money laundering—and possibly murder—by the Bank's client and his partners, and this fact was widely reported on by reputable German publications. *Id.* The U.S. Reputational Risk Committee was overruled by the Group Risk Committee, and the deal went through, even though Deutsche Bank's U.S. operation filed a suspicious activity report on itself. *Id.* According

38

to CW1, Defendant Cryan personally intervened to allow the sale of the property.  *Id*.

While the Supreme Court requires a *holistic analysis* of a complaint's scienter allegations, *Tellabs*, 127 S. Ct. at 2509, Defendants ignore most of them.  Instead, they improperly pluck a few allegations attributed to two of the eleven confidential witnesses, attempting to impugn their credibility.  (Defs' Br. at 38-39).  Defendants assail CW1's account that Defendant Cryan personally intervened to facilitate a transaction for Yusufov during the Class Period.  But this allegation is consistent with Deutsche Bank's years-long practice of the Bank's CEOs' involvement in onboarding and servicing PEPs and other high-risk clients.  That practice existed during CW1's employment and continued throughout the Class Period, as corroborated by other CWs.[17]  For example, CW2, who was employed at Deutsche Bank during the Class Period, recounted that during that time the Head of AFC for the Americas was routinely overruled by Deutsche Bank's Board, whose members were Cryan and Sewing.  Compl. ¶58.[18]  Defendants' attacks on CW2, *i.e.*, that the witness did not communicate with the individual defendants or was privy to their knowledge, also fail.  The Third Circuit has expressly rejected the type of smoking-gun allegations Defendants demand here.  *See Avaya*, 564 F.3d at 268-69 (rejecting a requirement that a witness have any communication with the person whose scienter is at issue, "or knowledge about the information or records to which [such person] had access").  Instead, the "totality-of-circumstances" test "ultimately rest[s] not on the presence or absence of certain types of allegations

---

[17] *See Local 731 I.B. of T. Excavators and Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (scienter inference where CWs' accounts corroborate each other and the complaint's other allegations); *see similarly In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *6 (D.N.J. Dec. 6, 2018).

[18] That CW1 was not employed at Deutsche Bank during the Class Period does not disqualify his/her account.  Information from outside the Class Period may be properly used to draw inferences about conditions during the Class Period.  *In re Merck & Co. Sec. Litig.*, 432 F.3d at 272) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period . . .'"; *accord*, *Avaya*, 564 F.3d at 249 n.13.

but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Id*. at 269.[19]

Likewise, the Third Circuit credits allegations about defendants' position within the corporate hierarchy where, as here, they are accompanied by other allegations of scienter. *Id*. at 270 (considering defendant's position as the Chief Financial Officer in the scienter analysis). In this respect, Defendants' own case supports scienter because the Individual Defendants were members of the Board, and the Complaint alleges that the Board continued approving Epstein as a client.[20] *See supra* at 3. Signed public filings by the Individual Defendants, when considered with the rest of the Complaint's allegations, also add to a strong inference of scienter. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp.2d 212, 228 (S.D.N.Y. 2008); *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *9 (D. Del. May 23, 2006).

In sum, when viewed holistically as required, the Complaint amply pleads scienter. The Individual Defendants' scienter is imputed to Deutsche Bank. Additionally, the scienter of Ng, Cullen, and Ford is also imputed to Deutsche Bank. As courts in this District and across the country have recognized, a corporate defendant's scienter is adequately alleged "where 'the pleaded facts create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter,'" including management-level employees, whether or not they are named defendants. *Sun v. Han*, 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015)

---

[19] Defendants' challenges to the credibility of these two witnesses are well beyond the scope of a motion to dismiss. *See*, *e.g.*, *Fitzer v. Security Dynamics Techs.*, 119 F. Supp. 2d 12, 21 (D. Mass. 2000).

[20] *Palladin Partners v. Gaon*, cited by Defendants, recognized that allegations of "mere membership" on an audit committee may suffice to establish a strong inference of scienter if "plaintiffs could plead that the audit committee was given information that should have alerted [defendant] to the fact that the company's financials were false." 2006 WL 2460650, at *13 (D.N.J. Aug. 22, 2006).

40

(emphasis added) ((quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.l Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), and holding that a corporate defendant's scienter was alleged where the complaint pled scienter as to some of its unnamed senior auditors); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *32- 33 (D.N.J. Aug. 8, 2018) (Walls, J.) (imputing scienter of "managerial agents . . . [who] ratified, recklessly disregarded, or tolerated the [company's] misrepresentation after its utterance or issuance" to companies who made those representations); accord, *In re Cognizant*, 2020 WL 3026564, at *24-32 (Salas, J.).[21]

### 3.      Motive, Though Not Required, Is Alleged

Defendants' motive arguments (Defs' Br. at 34-35) fail.  As an initial matter, "the absence of a motive allegation is not fatal."  *Tellabs*, 127 S. Ct. at 2511; accord, *Avaya*, 564 F.3d at 277. Here, Plaintiffs do plead a concrete, specific motive—the Individual Defendants' continued desire to retain access to the highest levels of Russian businessmen and politicians. Compl. ¶¶50-52.  That quest commenced with Deutsche Bank's former CEO, Josef Ackerman, and continued unabated throughout the Class Period under the Individual Defendants, through the retention of Russian oligarchs and politicians, and those connected to them.  Compl. ¶¶50-55.  The unique motives

---

[21] Accord, *Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *8 (D.N.J. June 5, 2020) (corporate scienter based on employees who were VP and Head of the Business Information Office, IT Strategy, and Process; the Senior Vice President of IT Solutions; and the Chief Technology and Product Officer); *Li v. Aeterna Zentaris, Inc.*, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016) (senior executive's scienter imputed to corporate defendant, though he was not alleged to have made any false statements); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2013 WL 396117, at *14 (D.N.J. Jan. 30, 2013) (rejecting argument that "a corporation's liability . . . is circumscribed by the imputed scienter of identifiable corporate agents"); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 410-13 (D.N.J. 2004) (associate general counsel's knowledge imputed to corporate defendant, despite absence of allegations that she made false statements); *Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (imputing knowledge to the corporate defendant from a vice president and assistant vice president).  There is simply "no requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).

Case 2:20-cv-08978-ES-JRA   Document 58   Filed 06/01/21   Page 54 of 55 PageID: 1464

alleged here are hardly common to every company.[22]

## V.   THE COMPLAINT STATES SECTION 20(A) CLAIMS

To plead a claim under Section 20(a), "plaintiffs must establish (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at \*4 (D.N.J. March 2, 2016). "[T]he overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss." *Id.*; *see also Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at \*13 (D.N.J. June 12, 2020).  Claims under Section 20(a) are subject only to Fed. R. Civ. P. 8's notice pleading standards.  *The Winer Family Trust v. Queen*, 2004 WL 2203709, at \*22 (E.D. Pa. Sept. 27, 2004) (collecting cases).  The Complaint easily alleges that the Individual Defendants, the Company's CEO and CFOs, were control persons of Deutsche Bank for purposes of Rule 8.  The Individual Defendants were the most senior executives at the Bank, and had the power and authority to control the contents of Deutsche Bank's SEC filings, press releases, statements posted on the Bank's official website, and frequently signed the Bank's statements containing the false and misleading statements. Compl. ¶¶21, 136-176, 230-31.[23]

### CONCLUSION

For the foregoing reasons, this action should not be transferred and Defendants' motion to dismiss should be denied in its entirety.  Should the Court find any deficiencies in the Complaint, however, Plaintiffs respectfully request leave to re-plead.

---

[22] Defendants' cases are inapposite.  *See Avaya, Inc.*, 564 F.3d at278-79 (mere general corporate desire to retire debt and raise funds); *In re Amarin Corp. PLC, Sec. Litig.*, 2015 WL 3954190, at \*11 (D.N.J. June 29, 2015) (generic desire to inflate, increase, or maintain stock price).

[23] Even if the Complaint were required to plead the Individual Defendants' culpable participation, it more than adequately does so.  The culpable participation analysis is "similar[]" to the scienter analysis. *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2015 WL 2250472, at \*26.  As discussed above, the Individual Defendants acted with scienter.

Dated: June 1, 2021

Respectfully submitted,


POMERANTZ LLP

*Emma Gilmore*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Dolgora Dorzhieva (admitted *pro hac vice*)
Villi Shteyn (*pro hac vice application pending*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
ddorzhieva@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Plaintiffs and for the Proposed Class*

*/s/  Terrence W. Scudieri, Jr.*
Terrence W. Scudieri, Jr.
POMERANTZ LLP

*Counsel for Plaintiffs and for the Proposed Class*

Peretz Bronstein
(*pro hac vice* application forthcoming)
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Fascimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Plaintiffs and for the Proposed Class*

43